# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP1033 |

| | |
|---|---|
| COMPLETE TITLE: | In the matter of the mental commitment of S. A. M.:<br><br>Sauk County,<br>      Petitioner-Respondent,<br>   v.<br>S. A. M.,<br>      Respondent-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 394 Wis. 2d 523, 950 N.W.2d 690
(2020 – unpublished)

| | |
|---|---|
| OPINION FILED: | June 23, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 28, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Sauk |
|   JUDGE: | Patrick J. Taggart |

JUSTICES:
KAROFSKY, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, HAGEDORN, and DALLET, JJ., joined. ZIEGLER, C.J., filed a concurring/dissenting opinion, in which ROGGENSACK and REBECCA GRASSL BRADLEY, JJ., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs filed by *Elizabeth G. Rich* and *Rich Law SC*, Plymouth. There was an oral argument by *Elizabeth G. Rich*.

For the petitioner-respondent there was a brief filed by *Douglas B. Raines* and *von Briesen & Roper, S.C.*, Milwaukee. There was an oral argument by *Douglas B. Raines*.

An amicus curiae brief was filed by *Colleen D. Ball*, assistant state public defender, with whom on the brief was *Kelli S. Thompson*, state public defender, for the Office of the State Public Defender. There was an oral argument by *Colleen D. Ball*.

**2022 WI 46**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2019AP1033
(L.C. No. 2017ME102)

STATE OF WISCONSIN     :     IN SUPREME COURT

**In the matter of the mental commitment of S. A. M.:**

**Sauk County,**

        **Petitioner-Respondent,**

    **v.**

**S. A. M.,**

        **Respondent-Appellant-Petitioner.**

**FILED**

**JUN 23, 2022**

Sheila T. Reiff
Clerk of Supreme Court

KAROFSKY, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, HAGEDORN, and DALLET, JJ., joined. ZIEGLER, C.J., filed a concurring/dissenting opinion, in which ROGGENSACK and REBECCA GRASSL BRADLEY, JJ., joined.

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 JILL J. KAROFSKY, J. This case involves the ability of involuntarily committed persons to receive appellate review of their commitment orders. Frequently, appellate courts dismiss these appeals as moot because the underlying commitment order expires before the court issues a decision on its merits.

Such routine dismissals result in the validity of these liberty-depriving orders largely evading review.

¶2   S.A.M. is among those committed citizens whose appeal went unaddressed because the order extending his commitment (also called "recommitment") expired before the court of appeals could decide the merits of his appeal.  He argues the court of appeals erred in dismissing his appeal as moot because either the order's ongoing collateral consequences render it not moot or an exception to mootness applies.  He further asks that if we rule in his favor on the mootness issue, that we then review the merits of his due-process and sufficiency-of-the-evidence challenges.

¶3   Though in Portage County v. J.W.K. we concluded that the expiration of the recommitment order rendered the appeal moot, that holding was expressly "limited to situations where . . . no collateral implications of the commitment order are raised."   2019 WI 54, ¶28 n.11, 386 Wis. 2d 672, 927 N.W.2d 509.  Collateral consequences having been raised here, we hold that at least two such consequences render an appeal of an expired recommitment order not moot: (1) the restriction of one's constitutional right to bear arms; and (2) the liability for the cost of one's care.  On the merits, we hold that S.A.M.'s due-process and sufficiency-of-the-evidence challenges fall short.  For those reasons, we reverse the court of appeals' dismissal of S.A.M.'s appeal and affirm S.A.M.'s recommitment order.

## I. BACKGROUND

¶4 Wisconsin's legal framework governing involuntary mental-health commitments is important to understanding this case. Before initially committing a person to the state or county's care, the government must prove by clear and convincing evidence that the person is: (1) mentally ill;[1] (2) a proper subject for treatment; and (3) currently dangerous under at least one of five standards. Wis. Stat. § 51.20(1)(a), (13)(e) (2019-20).[2] Those five standards are:

- First Standard: there is a substantial probability of physical harm to one's self evidenced by recent threats of or attempts at suicide or serious bodily harm;

- Second Standard: there is a substantial probability of physical harm to others evidenced by recent homicidal or other violent behavior, or a recent overt act, attempt or threat to do serious physical harm that placed others in reasonable fear of serious physical harm;

- Third Standard: there is a substantial probability of physical impairment or injury to one's self or others evidenced by a pattern of recent acts or omissions manifesting impaired judgment, and there is either no reasonable provision for one's protection in the

---

[1] The state or a county may also civilly commit a person who is drug dependent or developmentally disabled, but this opinion will focus on mental illness because that was the basis for S.A.M.'s commitment.

[2] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

community or a reasonable probability that one will not avail himself or herself of those services;

- Fourth Standard: there is a substantial probability that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue that makes one unable to satisfy basic needs as evidenced by recent acts or omissions, and there is either no reasonable provision for one's treatment and protection in the community or a reasonable probability that one will not avail himself or herself of those services; and

- Fifth Standard: (1) there is a substantial probability both that one needs care or treatment to prevent further disability or deterioration and that, if left untreated, one will lack necessary services and suffer severe mental, emotional, or physical harm that will result in the loss of one's ability to function independently in the community or the loss of cognitive or volitional control over one's thoughts or actions; (2) either (a) an incapability of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives after such were explained, or (b) a substantial incapability of applying such an understanding to one's mental illness to make an informed choice as to whether to accept or refuse medication or treatment; and (3) either no reasonable provision for one's care or treatment in the community or a reasonable

4

probability that one will not avail himself or herself of those services.

§ 51.20(1)(a)2.[3] Upon sufficient evidence of both a treatable mental illness and at least one of these forms of dangerousness, the circuit court must order the person initially committed for no more than six months. § 51.20(13)(a), (g)1. It must then also issue a firearms ban, i.e. "order the individual not to possess a firearm, [and] order the seizure of any firearm owned by the individual." § 51.20(13)(cv)1.

¶5 The government may thereafter seek to extend the initial commitment. Recommitment again requires clear and convincing evidence of the same three elements required for the initial commitment: mental illness, treatability, and current dangerousness under at least one of the five standards outlined above. Recommitment proceedings can differ from initial commitment proceedings in one significant way. In an initial commitment proceeding, the government may prove dangerousness only with evidence of recent acts, omissions, or behavior. In a recommitment proceeding, though, the government may alternatively prove dangerousness by "showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment [under one of the five dangerousness standards] if treatment were withdrawn." § 51.20(1)(am). If the

---

[3] This summary of the statutory dangerousness standards omits elements not relevant to S.A.M.'s case and thus is not applicable to every civil commitment.

government presents clear and convincing evidence that the committed person remains mentally ill, treatable, and dangerous under one of the five standards (whether by recent conduct or via the § 51.20(1)(am) alternative showing), then the court must order that person recommitted for a period not to exceed one year, along with another firearms ban. § 51.20(13)(cv)1., (g)1. & (g)3.

¶6 Given these orders' limited duration, timely appellate review before their expiration proves difficult. The court of appeals reports that between 2018 and 2020, it issued no decision regarding an initial six-month commitment before the order expired. Recommitment orders, which last for generally one year, fared somewhat better; the court of appeals decided 40 percent of those appealed before their expiration. Though the reasons for delay vary, rarely does fault lie with the person committed——as is certainly the case for S.A.M.

¶7 S.A.M. is diagnosed with bipolar disorder with psychotic features. In late 2017, S.A.M. was subjected to an emergency detention after his father reported that he made statements about wanting to die. His father informed the responding sheriff that S.A.M. had been homeless for some time. S.A.M. displayed signs of malnourishment and suffered from trench foot due to not changing his shoes for long periods of time. An examining psychiatrist noted that S.A.M. had discontinued taking previously prescribed medication and had a long history of such noncompliance. S.A.M. admitted to acts of self-harm and substance abuse, predominantly alcohol but illicit

6

drugs as well. In January 2018, in statements to his sister, S.A.M. threatened self-harm and told her he wanted to die. Based on this behavior, Sauk County ("the County") successfully petitioned to have S.A.M. involuntarily committed to its care for six months of compelled treatment. This initial commitment order included a firearms ban that would "remain in effect until lifted by the court" and survive the commitment order's expiration. S.A.M. did not appeal this initial commitment order.

¶8 Before the initial commitment order expired, the County petitioned to extend S.A.M.'s involuntary commitment. The petition contained two relevant representations from psychiatrist Dr. Linda DiRaimondo: (1) S.A.M. suffers from a "chronic mental disorder" (bipolar disorder); and (2) though currently medication compliant, S.A.M. "has not been in the past when not on commitment and has regressed to an acute psychotic state and required hospitalization." On those bases, Dr. DiRaimondo opined that there is "a substantial likelihood, based on [S.A.M.'s] treatment record, that if treatment were withdrawn, [he] would regress and become a proper subject for commitment." The day before the recommitment trial, S.A.M. filed a motion asking, in part, for the circuit court[4] to order the County to "elect under which standard of dangerousness it seeks to proceed" and preclude it "from presenting evidence as to other forms of dangerousness."

---

[4] The Hon. Patrick J. Taggart of the Sauk County Circuit Court presided.

7

¶9 The circuit court addressed S.A.M.'s motion at the start of the trial. S.A.M. argued that the petition "clearly enunciated" only one method of proving dangerousness—the recommitment alternative under Wis. Stat. § 51.20(1)(am) that there was a substantial likelihood S.A.M. would be a proper subject for commitment if treatment were withdrawn. According to S.A.M., that theory was contradicted by the County's proposed order, which did not include the language of § 51.20(1)(am) but instead broadly stated that S.A.M. was "dangerous because the subject evidences behavior within one or more of the standards under §§ 51.20(1) or (1m), Wis. Stats. (except for proceedings under § 51.20(1)(a)2.e., Wis. Stats.)." S.A.M. argued these imprecise filings violated his right to due process by providing inadequate "notice of what he's up against." The County stood by its petition's reliance on § 51.20(1)(am) and asserted, "there's a substantial likelihood that [S.A.M.] would be a proper subject for commitment if treatment were withdrawn. And that's what the county intends to show today." The circuit court accepted the County's assertion, inviting S.A.M.'s objection if the County began to introduce evidence supporting a different theory of dangerousness.

¶10 The circuit court then proceeded with the trial. Dr. DiRaimondo and S.A.M.'s social worker, Brigette Chizek, both testified in favor of recommitment; S.A.M. testified against it. Dr. DiRaimondo repeated her bipolar disorder diagnosis of S.A.M. and affirmed it was treatable. As to S.A.M.'s dangerousness, she opined that S.A.M. "would not take his medication if he were

8

not on a court order" based on his treatment record, which showed that when not in a supervised setting, "he has stopped his medication" and that he "recently told his case manager" that "he does not feel he needs . . . medication."

¶11 Chizek then testified to S.A.M.'s history of substance abuse, medication noncompliance, and resulting mental-health instability and self-harm ideations. She averred that S.A.M., after being told of the services available to him to assist his independence, "talks about not wanting those," with the exception of the community support program in which he was currently participating. She stated his post-commitment plan was to stay with his grandmother and then at a motel until he could find a place to live. But she recounted how he had previously disappeared from his grandmother's home, which led to the events underlying his initial commitment discussed above. She expressed her concern that a similar scenario would play out if treatment were withdrawn and affirmed that he currently needed a structured setting. She also recounted that S.A.M. had recently urinated in his pants and refused to change out of the soiled clothing. Finally, she acknowledged that as recently as the past month, S.A.M. told her he would continue his medications if released from his commitment.

¶12 Taking the witness stand last, S.A.M. reaffirmed his statement about staying medication compliant post-commitment and agreed that the medication benefited him in managing his mental illness. He explained that he hoped to start working as a laborer, as he has in the past. He further testified that he

9

would not repeat his past mistake of going off medication, chalking his recent lapse up to the "hard times" he was experiencing six months prior.

¶13 The circuit court, after recounting all of this evidence, found grounds for a six-month recommitment order. The recommitment order also provided that S.A.M. "is prohibited from possessing any firearm. . . . This prohibition shall remain in effect until lifted by the court. Expiration of the mental commitment proceeding does not terminate this restriction."

¶14 S.A.M. timely filed his notice of intent to pursue post-commitment relief. An unfortunate series of events then delayed his appeal. First, the State Public Defender was unable to appoint S.A.M. post-commitment counsel until more than four months into his six-month commitment (nearly three months after the deadline to appoint appellate counsel). Then, it took another two months for the full record, including transcripts, to be transmitted to appointed counsel——just as the recommitment order was expiring. Next, S.A.M.'s attorney delayed filing his notice of appeal, albeit with good cause. Additional months passed before the court of appeals received the record.

¶15 By this time, S.A.M.'s appeal had been expired for over six months. Consequently, the court of appeals directed the parties to brief whether the case was moot. The court of appeals finally rendered its decision in September 2020——over two years after the circuit court issued the six-month recommitment order. See Sauk County v. S.A.M., No. 2019AP1033, unpublished slip op. (Wis. Ct. App. Sept. 3, 2020). The court

10

of appeals dismissed S.A.M.'s appeal as moot, concluding that the order neither caused ongoing collateral consequences nor presented an issue triggering a mootness exception.  Id.

¶16 We granted S.A.M.'s petition for review on the mootness issue as well as the merits issues he raised.  We additionally asked the parties to brief the following issue:

> Whether this court has the authority, through its "superintending and administrative authority over all courts" (Wis. Const. art. VII, § 3(1)) and/or its authority to "regulate pleading, practice, and procedure in judicial proceedings in all courts" (Wis. Stat. § 751.12(1)), to require the court of appeals to expedite the disposition of appeals under Wis. Stat. ch. 51, or in some other manner to ensure that appellants under Wis. Stat. ch. 51 receive an appeal that addresses the merits of the appellants' contentions?

## II.  STANDARD OF REVIEW

¶17 This case presents issues of mootness, procedural due process, and sufficiency of the evidence.  Both mootness and procedural due process present questions of law we review de novo.  Marathon County v. D.K., 2020 WI 8, ¶16, 390 Wis. 2d 50, 937 N.W.2d 901 (mootness); Teague v. Schimel, 2017 WI 56, ¶19, 375 Wis. 2d 458, 896 N.W.2d 286 (procedural due process).  Whether the County presented clear and convincing evidence to justify recommitment is a mixed question of fact and law.  Langlade County v. D.J.W., 2020 WI 41, ¶24, 391 Wis. 2d 231, 942 N.W.2d 277.  S.A.M. challenges only the legal application of the undisputed facts to the statutory standards, which we review de novo.  Id., ¶25.

11

### III.  ANALYSIS

¶18 Our analysis begins with the mootness question, focusing on whether the collateral consequences of expired recommitment orders render appeals of such orders not moot. Because we determine that the ongoing collateral consequences of recommitment do render these appeals not moot, we turn to the merits of S.A.M.'s due-process and sufficiency-of-the-evidence claims.

### A.  Mootness

¶19 In Wisconsin, dismissal of a case as moot is an act of judicial restraint rather than a jurisdictional requirement. See D.K., 390 Wis. 2d 50, ¶19.  A case is moot when the resolution of an issue will have no practical effect on the underlying controversy. See id.  This means an appeal from an order like S.A.M.'s is not moot when the direct or collateral consequences of the order persist and vacatur of that order would practically affect those consequences.  See id., ¶23 (citing State v. Theoharopoulos, 72 Wis. 2d 327, 240 N.W.2d 635 (1976)).  Here, S.A.M. posits that three collateral consequences from his now-expired recommitment order render his appeal not moot:  (1) the firearms ban; (2) the liability for the cost of his care while committed; and (3) the stigma associated with a mental-health commitment.

¶20 We recently explained that whether a collateral consequence renders an appeal not moot turns on the existence of a "causal relationship" between a legal consequence and the challenged order.  See id., ¶¶23-25 (quoting Theoharopoulos, 72

12

Wis. 2d at 333).   We conclude such a causal relationship exists between a recommitment order and at least two collateral consequences:   (1) the firearms ban; and (2) the liability for the cost of care.   We address each in turn.

## 1.   Firearms ban

¶21   Two terms ago, we held that an appeal of an expired initial commitment order is not moot because the order collaterally subjects the committed person to a continuing firearms ban.   See id., ¶25.   We recognized that this firearms ban constitutes an ongoing impairment of the person's constitutional right to bear arms, which we deemed to be "no minor consequence."   Id. (citing U.S. Const. amend II; Wis. Const. art. I, § 25; District of Columbia v. Heller, 554 U.S. 570 (2008); Wis. Carry, Inc. v. City of Madison, 2017 WI 19, 373 Wis. 2d 543, 892 N.W.2d 233).   We also explained that prevailing in an appeal of an expired initial commitment order voids the firearms ban.   Id.   Because voiding the firearms ban is a "practical effect" that has a "causal relationship" to the successful appeal of an expired initial commitment order, we deemed the appeal not moot.   Id.

¶22   The question before us is whether that same rationale applies to recommitment orders.   The court of appeals concluded it did not.   In its view, with which the County agrees, vacating the recommitment order and voiding its corresponding firearms ban would have no practical effect because the separate ban attached to S.A.M.'s unchallenged initial commitment order would still be in effect.   S.A.M., No. 2019AP1033, at ¶¶8-12.

13

¶23 We disagree. The court of appeals is correct that the firearms ban attached to an initial commitment will continue to bar the committed person from possessing a firearm even if we vacate a subsequent recommitment order. But that fact does not mean prevailing in a recommitment appeal would have no "practical effect" on restoring one's constitutional right. Prevailing on appeal would vacate the recommitment order and practically alter a committed person's "record and reputation" for dangerousness, a factor a reviewing court must consider when weighing a petition to cancel a firearms ban. § 51.20(13)(cv)1m.b. Additionally, if a committed person succeeds in vacating an expired recommitment order, the fact that the recommitment order no longer exists might influence the reviewing court's weighing of whether restoring gun rights would be consistent with the "public interest." Id. Even if marginal, these practical effects on a committed person's ability to restore a constitutional right remain "no minor consequence." D.K., 390 Wis. 2d 50, ¶25. Thus, the "causal relationship" between these practical effects and our vacatur of an expired recommitment order renders an appeal of such orders not moot.

### 2. Cost of care liability

¶24 Likewise, a person's mandatory liability for the cost of the care received during a recommitment is a collateral consequence that renders recommitment appeals not moot. Under Wis. Stat. § 46.10(2), a committed person like S.A.M. "shall be liable for the cost of the care, maintenance, services and

14

supplies" related to each commitment period. If the underlying commitment order is vacated, however, the liability tied to that particular commitment period no longer exists. See Jankowski v. Milwaukee County, 104 Wis. 2d 431, 438-40, 312 N.W.2d 45 (1981); Ethelyn I.C. v. Waukesha County, 221 Wis. 2d 109, 120-21, 584 N.W.2d 211 (Ct. App. 1998). For that reason, a direct causal relationship exists between vacating an expired recommitment order and removing the liability it creates, sufficient to render recommitment appeals not moot.

¶25 The court of appeals' contrary position, again adopted by the County, is that S.A.M. failed to show "actual monetary liability" because he presented no evidence of collection efforts against his debt by the time of the appeal. See S.A.M., No. 2019AP1033, at ¶14. This position misses the mark for two related reasons. First, it is irrelevant whether collection efforts have begun because, regardless, S.A.M. remains liable solely by virtue of § 46.10(2)'s mandatory language ("shall be liable"). And second, it is enough to overcome mootness when there is the "potential" for collection actions because of the liability. See State v. McDonald, 144 Wis. 2d 531, 537, 424 N.W.2d 411 (1988) (holding that a deceased defendant's appeal was not moot because his conviction may lead to "potential collateral consequences" for his estate); see also D.K., 390 Wis. 2d 50, ¶24 (applying to ch. 51 commitment orders the same collateral-consequences rationale used in criminal cases). The threat of potential collection actions to recoup the costs associated with S.A.M.'s recommitment care may follow S.A.M.

15

unless and until his recommitment order is vacated or the liability is satisfied.  See Jankowski, 104 Wis. 2d at 438.

¶26 We are also not persuaded by the County's argument that a committed person's liability is contingent on a person's ability to pay.  That is simply not the law.  A "liable person['s] ability to pay" only informs to whom collection efforts should be directed, see § 46.10(3), and what, if any, settlement or agreement might be appropriate to satisfy the debt, see § 46.10(7).  Neither of those considerations, however, extinguish the liability.  And in fact, this liability permits the government to continually probe S.A.M.'s financial condition to reevaluate his ability to pay.  See § 46.10(8)(c).  Thus, vacating a recommitment order will have the practical effect of removing the order's attached liability, regardless of the person's ability to pay.

¶27 Accordingly, we conclude an appeal of an expired recommitment order is not moot because vacating the order would still have practical effects on two of the order's collateral consequences——the ability to restore a constitutional right and the liability for the cost of care received while subject to the

recommitment order.[5] Because S.A.M.'s appeal is not moot, we turn to the merits of his appeal.

## B. Due Process

¶28 On the merits, S.A.M. first argues the County's imprecise pretrial filings violate his due-process right to adequate notice as to which specific theory of dangerousness justified his recommitment.[6] S.A.M.'s argument relies solely on our recent D.J.W. decision. There, we required "clarity . . . regarding the underlying basis for a recommitment," such that "going forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of § 51.20(1)(a)2. on which the recommitment is based." D.J.W., 391 Wis. 2d 231, ¶¶40, 42. According to S.A.M., due process demands that recommitment petitions provide the same type of "clarity."

¶29 S.A.M.'s reliance on D.J.W. is misplaced for two reasons. First, D.J.W. addressed a circuit court's legal responsibility to facilitate meaningful appellate review, not a

---

[5] Given this holding, we refrain from addressing S.A.M.'s stigma argument. See Md. Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15. And because his appeal is not moot, we need not address any exceptions to mootness. See id. For related reasons, we determine this case is not the proper vehicle in which to address our constitutional and statutory authority to expedite review of appeals from civil commitment orders.

[6] The government may not "deprive any person of life, liberty, or property, without due process of law," which includes a procedural right to notice. See Wis. Const. amnd. XIV, § 1; Milewski v. Town of Dover, 2017 WI 79, ¶23, 377 Wis. 2d 38, 899 N.W.2d 303.

county's pretrial notice responsibilities. And second, our April 2020 D.J.W. decision indicated relief under its holdings would be prospective; its holding does not reach back to S.A.M.'s 2018 recommitment trial. See id., ¶59. Because S.A.M. relies only on the inapt D.J.W. to support his due-process claim, we cannot say the County's notice violated his procedural due-process rights. See Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d 35 ("We do not step out of our neutral role to develop or construct arguments for parties." (citing State v. Pal, 2017 WI 44, ¶26, 374 Wis. 2d 759, 893 N.W.2d 848)).

### C. Sufficiency of the Evidence

¶30 S.A.M. next challenges whether the evidence sufficiently establishes his dangerousness under any standard.[7] To be sufficient, the evidence must be clear and convincing that an individual is currently dangerous; it is not enough to show only that a person once was dangerous. D.J.W., 391 Wis. 2d 231, ¶34 (citing J.W.K., 386 Wis. 2d 672, ¶24). In a recommitment proceeding, the evidence may take the form of either: (1) recent acts, omissions, or behaviors exhibiting dangerousness; or (2) evidence that if treatment were withdrawn the person would be substantially likely to engage in the types of dangerous acts, omissions, or behaviors that meet one of the five dangerousness standards. See Wis. Stat. § 51.20(1)(a)2., (1)(am).

---

[7] S.A.M. does not challenge the circuit court's conclusions that he is mentally ill and a proper subject for treatment.

¶31 S.A.M. levels two sufficiency arguments. First, he contends that the evidence under either evidentiary pathway is insufficient. Second, he contends that the County's witnesses failed to recite the statutory standards being applied with near exactness as Outagamie County v. Melanie L., 2013 WI 67, 349 Wis. 2d 148, 833 N.W.2d 607, allegedly requires. We disagree with both contentions.

### 1. Sufficient evidence

¶32 We are persuaded that the evidence sufficiently establishes that S.A.M. is dangerous under the Third Standard by way of the recommitment alternative. See Wis. Stat. § 51.20(1)(a)2.c., (1)(am). Under those two provisions, the County's burden was to show a substantial likelihood, based on S.A.M.'s treatment history, that if treatment were withdrawn he would again face "a substantial probability of physical impairment or injury to himself" and that there is either no "reasonable provision for [his] protection . . . available in the community" or that S.A.M. would not, to a "reasonable probability," "avail himself . . . of these services." Id.

¶33 The circuit court aptly summarized much of the record. It recounted Dr. DiRaimondo's testimony about S.A.M. telling his case manager "that he didn't need [his medication]," as well as her own opinion that "if there's no court order, [S.A.M.] won't take his medications." The circuit court then reiterated the social worker's testimony that when S.A.M. is off medication and "on his own, he is unstable, threat[ens] to harm himself, [and is] not compliant when he's in the group home." Though S.A.M.

19

promised he would maintain medication compliance absent a court order, the circuit court was skeptical about S.A.M.'s explanation that his recent noncompliance and resulting dangerousness were solely the result of "hard times":

> Certainly the Court understands hard times, but those hard times certainly may and may be likely to continue in the future. Whether one is on a court order or not, hard times happen. And the Court has a duty to make sure that if they happen, that [S.A.M.] has the proper treatment to deal with, with those hard times when he would be on his own.

It is evident the circuit court found S.A.M. not credible on this point, a finding to which we defer. See Metro. Assocs. v. City of Milwaukee, 2018 WI 4, ¶61, 379 Wis. 2d 141, 905 N.W.2d 784 ("When the trial court acts as the finder of fact, it is the ultimate arbiter of the credibility of the witnesses and of the weight to be given to each witness's testimony." (quoting Lessor v. Wangelin, 221 Wis. 2d 659, 665, 586 N.W.2d 1 (Ct. App. 1998)). Instead, the circuit court expressly agreed with the two professionals' shared "concern that this situation may happen all over again if the Court does not grant the . . . extension," i.e. if compelled treatment is withdrawn.

¶34 The evidence further addresses the likelihood that S.A.M. would avail himself of community resources available for his protection. S.A.M.'s social worker testified that "[w]hen talking about what services are available"——including services that would assist his living independently——"he talks about not wanting those." Moreover, the circuit court recounted her testimony about S.A.M. disappearing from his grandmother's home—

20

—leading to the events underling his initial commitment——"under somewhat of the same circumstances that he proposes now to live with his grandmother, move to a motel and get a job."  While the circuit court acknowledged "that's a good plan," it also recognized that "as recently as six months ago that plan didn't work out" and failed to provide for his protection.  Taken together, we conclude that the evidence sufficiently proves S.A.M. is dangerous under the Third Standard via the § 51.20(1)(am) recommitment alternative.

## 2.  Melanie L.

¶35  S.A.M.'s reliance on Melanie L. is also unavailing. Melanie L. involved a county expert's "failure to answer questions using the terms in the statute."  349 Wis. 2d 148, ¶91.  The expert opined that "Melanie was incapable of applying an understanding of the medication 'to her advantage.'"  Id.  By contrast, the statutory standard demanded that she be "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness . . . to make an informed choice as to whether to accept or refuse medication or treatment."  Wis. Stat. § 51.61(1)(g)4.b.  Because there was conflicting evidence on this standard, we concluded that the expert's deviation from the statutory terms cast doubt on whether the expert "was applying the standard or changing the standard." Melanie L., 349 Wis. 2d 148, ¶90-91.  As such, the County failed to meet its clear-and-convincing burden.  Id., ¶94.

21

¶36 We face a different record here than we did in Melanie L. The record before us shows the circuit court, parties, and witnesses all in accord regarding the statutory standards they were applying. The County made clear at the outset that it "intends to show today" that "there's a substantial likelihood that the individual would be a proper subject for commitment if treatment were withdrawn," as § 51.20(1)(am) requires. Though no witness recited the Third Standard with exactness, the experts' repeated references to S.A.M. both reporting and threatening self-harm make clear to this court that they were properly assessing the "probability of physical impairment or injury to himself" if the commitment ended. We therefore conclude the evidence on S.A.M.'s dangerousness sufficiently justified his recommitment.

## IV. CONCLUSION

¶37 Though S.A.M.'s recommitment order expired, the ongoing collateral consequences causally related to it could be practically affected by a favorable decision, rendering his appeal not moot. The merits of his appeal, however, do not warrant vacating the recommitment order. As such, we reverse the court of appeals' dismissal of S.A.M.'s appeal but affirm the circuit court's recommitment order.

*By the Court.*—The decision of the court of appeals is reversed.

22

¶38 ANNETTE KINGSLAND ZIEGLER, C.J. *(concurring in part, dissenting in part).* I agree with the majority that the recommitment order should be affirmed. I dissent from the majority opinion because it upends the longstanding mootness doctrine in a recommitment appeal. To the extent the court is disappointed with the delay in this case, so am I. However, the volume of similar cases that will await the appellate system in the future because of this opinion does not bode well for better case processing. With no moot appeals in these cases, the appellate system will be flooded.

¶39 It would be one thing had the court concluded that an exception to the mootness doctrine was fulfilled because this issue is capable of repetition yet is likely to evade review. However, the court did not. Instead, the court inexplicably chose this case to overturn the mootness doctrine. Spending most of its analysis on doing away with the mootness doctrine in recommitment cases, the court decides that S.A.M. faces "collateral consequences."[1] Of course there can be consequences of a commitment——direct and collateral. In and of themselves,

---

[1] The term "collateral consequences" is a term of art in the criminal context. See State v. Byrge, 2000 WI 101, ¶¶60-61, 237 Wis. 2d 197, 614 N.W.2d 477 (explaining in the plea withdrawal context that a "direct consequence [of a conviction] . . . is one that has a definite, immediate, and largely automatic effect," while "[c]ollateral consequences are indirect and do not flow from the conviction" such as consequences that "rest[] not with the sentencing court, but instead with a different tribunal or government agency"). This meaning does not fit well within the commitment context. See Marathon Cnty. v. D.K., 2020 WI 8, ¶¶23-25, 390 Wis. 2d 50, 937 N.W.2d 901 (analyzing "collateral consequences," including firearms bans, in the commitment context).

the existence of potential and unproven collateral consequences alone have never been determinative of mootness or lack thereof. Restrictions on the ability of S.A.M. to possess a firearm because of this recommitment and uncertain and unpursued potential financial liability as a result of the recommitment order are nothing more than theoretical possibilities. The relevant order expired. We ought not presume collateral consequences that do not exist. Here there are none. I am concerned about the unintended consequences of the court's error.

¶40 I agree that this case took far too long to process, but that defect should not cause the court to dismantle the established law on collateral consequences or the doctrine of mootness. A theoretical and unproven collateral consequence has never been a standalone reason to conclude that a case is not moot. There are many potential consequences of being committed, yet in the past we have nonetheless correctly concluded that cases are moot. Portage County v. J.W.K., 2019 WI 54, 386 Wis. 2d 672, 927 N.W.2d 509 (concluding that a sufficiency of the evidence challenge to a Chapter 51 recommitment was moot when the order expired). Apparently the court sub silentio overrules J.W.K. and every other case that deemed a commitment or recommitment appeal to be moot. The majority fails to answer what if any limits might apply. The majority does not and cannot differentiate S.A.M.'s firearms ban or possible financial liability from that of any other commitment or recommitment. The majority makes no mention of the practical effect of a

2

firearms ban or possible liability on S.A.M. that might be different from any other recommittee. See State ex rel. Riesch v. Schwarz, 2005 WI 11, ¶11, 278 Wis. 2d 24, 692 N.W.2d 219 (holding that a case is moot where the litigants fail to demonstrate that resolution of the case would have a "practical effect" on the case and parties).

¶41 In fact, S.A.M. faces a firearms ban regardless of his recommitment, and there is no indication the government has or will pursue recovery in his initial commitment let alone this recommitment. The majority fails to analyze why this case, as opposed to any other, is an exception to the mootness doctrine. The opinion is devoid of any explanation why these facts are unique or what the practical effect is for S.A.M. that would not be the exact same for any other. Because the law on the mootness doctrine and collateral consequences has been upended and reinvented by the majority opinion, and it needlessly opens the floodgates to appellate review of all commitments and recommitments, I dissent.

¶42 Appeals are sometimes moot, and this case is one example of an appeal that is otherwise moot. Marathon Cnty. v. D.K., 2020 WI 8, ¶19, 390 Wis. 2d 50, 937 N.W.2d 901 ("Mootness is a doctrine of judicial restraint. An issue is moot when its resolution will have no practical effect on the underlying controversy. Because moot issues do not affect a live controversy, this court generally declines to reach them. But we may overlook mootness if the issue falls within one of five exceptions: (1) the issue is of great public importance; (2)

3

the issue involves the constitutionality of a statute; (3) the issue arises often and a decision from this court is essential; (4) the issue is likely to recur and must be resolved to avoid uncertainty; or (5) the issue is likely of repetition and evades review." (Citations omitted.)); id., ¶22 ("We have previously concluded that an expired initial commitment order is moot." (citing Winnebago Cnty. v. Christopher S., 2016 WI 1, 366 Wis. 2d 1, ¶30, 878 N.W.2d 109).).

¶43 The majority does not decide this case because of any of the foregoing exceptions to mootness. It does not conclude that the issue is capable of repetition yet is likely to evade review. See J.W.K., 386 Wis. 2d 672, ¶¶29-30. While a firearms ban may be considered a "collateral consequence," it is not with regard to S.A.M.'s recommitment order. In fact, the recommitment order has no impact on his inability to possess a firearm. He is otherwise subject to a firearms ban in his initial order. Nonetheless, the majority somehow concludes that S.A.M.'s firearms ban in his recommitment order defeats any claim of mootness. In addition, the majority concludes that theoretical, speculative, and highly unlikely financial liability exists for this recommitment, even when there is no indication it will be pursued and no indication it was pursued for the initial commitment. Without any mention of distinguishing facts of S.A.M.'s recommitment, and since these are consequences of every commitment or recommitment, the majority opinion leads to the inescapable conclusion that no

4

commitment or recommitment appeal is ever moot. I respectfully disagree.

¶44 S.A.M. identifies three potential collateral consequences that he contends make his appeal not moot. He contends the firearms ban, the monetary liability for care, and social stigma are the collateral consequences that save his appeal. The majority adopts two of the three, without any supporting evidence of them being actual consequences, and concludes that they are collateral consequences. S.A.M. does not demonstrate that either of these are actual or even likely consequences of his recommitment. This appeal is of his recommitment, not his commitment.

¶45 A firearms ban has been labeled a collateral consequence, but it has never been an automatic exception to mootness in a recommitment hearing. Here, this is the issue to be decided. In this case, the circuit court prohibited S.A.M. from possessing any firearms when it ordered his initial commitment. That prohibition was not lifted. S.A.M. did not appeal his initial commitment order. He does not argue in this case that the initial commitment was legally improper, unsupported by factual evidence, or otherwise subject to revocation. Thus, it is undisputed that, no matter what the outcome of the current appeal, S.A.M. will not be able to possess a firearm and will not be able to do so until he seeks review of the firearms ban contained in the original commitment order. S.A.M. has not demonstrated that his right to possess a

5

firearm is in any way impacted by the firearms ban from his recommitment order.

¶46 Although S.A.M. speculates that two valid firearms bans could, at some point in time, impact his ability to lift the initial firearms ban, he cites no allegation or evidence that he intends to challenge the initial firearms ban, nor does he cite any basis for the court to conclude that such a challenge would somehow be successful. A firearms ban can be revoked only if the court, in its discretion, determines S.A.M. is "not likely to act in a manner dangerous to public safety and [revoking the ban] would not be contrary to public interest." Wis. Stat. § 51.20(13)(cv)1m.b. Moreover, given that S.A.M. was subject to his initial commitment and recommitment in the same county, S.A.M. could seek revocation of both the initial firearms ban and the firearms ban included in his recommitment order if and when he challenges the initial recommitment order. § 51.20(13)(cv)1m.a. (stating that individuals may file a petition to revoke a firearms ban either at the court that ordered the ban or "in the county where the individual resides to cancel the order"). When considering whether to revoke the initial firearms ban, the circuit court would need to review "the individual's record and reputation." § 51.20(13)(cv)1m.b. S.A.M.'s record would be the same whether the court was reviewing the initial firearms ban or the ban included in the recommitment order. I note that this court affirms his recommitment order.

6

¶47 It would be pure speculation to predict whether and to what extent a reversal of the recommitment order here, which has not happened, would impact how the initial firearms ban would be reviewed by a circuit court in future proceedings. S.A.M.'s argument that resolution of this appeal will, at some point, allow him to own a firearm is mere guesswork, which cannot overcome mootness concerns. See Riesch, 278 Wis. 2d 24, ¶11 (explaining that a case is moot where resolution of the case would not have a "practical effect" on the case and litigants); PRN Assocs. LLC v. DOA, 2009 WI 53, ¶¶30, 49, 317 Wis. 2d 656766 N.W.2d 559 (holding that a case was moot where resolution of the case would not provide the plaintiff any form of effective relief). I recognize that a firearms ban has profound consequences and is a collateral or perhaps direct consequence in most circumstances, but it alone does not control whether an appeal of a recommitment is moot. Here, S.A.M. has not demonstrated that the firearms ban in his recommitment is an exception to mootness.

¶48 Second, as to S.A.M.'s financial argument, Wisconsin law states that individuals who are involuntarily committed may be required to pay for their care to the extent they are able. Wis. Stat. § 46.10(2). However, there has been absolutely no showing that S.A.M. is in any way liable for his care or that the government seeks or will seek any such reimbursement. In fact, the County stated at oral argument that it has no intention to seek such relief from S.A.M. Why would the government first seek costs of recommitment when there is no

7

indication it sought costs in the initial commitment? Plus, legal protections are in place should such recovery someday be sought. Recovery for the cost of care would require litigation on legal claims and issues that are not before us and, up to this point, have not been advanced in any other court proceedings.

¶49 For S.A.M. to be held liable for the costs of care, the County would first have to choose to advance its claims. There is no available evidence showing that the County will or is likely to pursue such a claim. In addition, the County would have to comply with numerous legal requirements before obtaining a money judgment against S.A.M. By statute, the County must prove the "costs of the care, maintenance, services and supplies" provided to S.A.M. § 46.10(2). Furthermore, the County must conduct an "investigation" and consider S.A.M.'s "ability to pay." § 46.10(3). "[U]nder all of the circumstances," the government may collect only from those individuals and assets that are best able to pay and those the committee is not "dependent upon." § 46.10(2)-(3). In addition, this court held in Jankowski v. Milwaukee County, 104 Wis. 2d 431, 435-38, 312 N.W.2d 45 (1981), that the state cannot collect costs of care for Chapter 51 commitments or detentions that were illegal or invalid. See, e.g., Waukesha Memorial Hosp. v. Nierenberger, No. 2013AP480, unpublished slip op., ¶¶12-15 (Wis. Ct. App. Oct. 15, 2013) (considering whether an individual could be liable for a hospital bill after a Chapter 51 emergency detention by first reviewing whether the detention

8

was valid). To recover from S.A.M., the County must overcome any other defenses S.A.M. may have. See, e.g., § 46.10(11)(a) ("[I]n any action to recover from a person liable under this section, the statute of limitations may be pleaded in defense."). Here there is absolutely no indication S.A.M. himself could be financially responsible for his care.

¶50 To overcome mootness concerns, S.A.M. asks that we speculate that the state, at some point in time in the future, will seek to recoup the costs of care, that S.A.M. will have the ability to pay, that the state fully satisfies Wis. Stat. § 46.10, and that S.A.M. will not have any valid defense to assert. S.A.M.'s argument relies on a series of assumptions, yet we have absolutely no indication in the record before us that any of those assumptions are legitimate. The majority's conclusions have sweeping consequences which are contrary to our mootness doctrine. See City of Racine v. J-T Enters. of Am., Inc., 64 Wis. 2d 691, 701-02, 221 N.W.2d 869 (1974) (holding that a case was moot in a zoning dispute where a municipality asked for a ruling on the legality of land use which it believed would occur in the future, and reasoning that simply because a legal dispute may occur "at some time in the future" could not serve to overcome mootness); Ziemann v. Village of N. Hudson, 102 Wis. 2d 705, 708, 710-11, 307 N.W.2d 236 (1981) (concluding that a case was moot where property owners sued to prevent the sale of land to a municipality to use the property as a park when the sale was completed, even though there could be a future legal dispute over the use of the property as a park); see also

9

United States v. Juvenile Male, 564 U.S. 932, 937 (2011) ("One can never be certain that findings made in a decision concluding one lawsuit will not someday control the outcome of another suit. But if that were enough to avoid mootness, no case would ever be moot" (cleaned up).).

¶51 Finally, no Wisconsin court has ever concluded that social stigma alone is a collateral consequence of commitment that will defeat the mootness doctrine. In fact, S.A.M. fails to demonstrate that he has experienced any social stigma, let alone social stigma as a result of the recommitment. I would not invariably extend social stigma of a recommitment to the level of being a collateral consequence. S.A.M. fails to provide any evidence or describe what negative consequences he himself has experienced and will continue experiencing as a result of the recommitment order. Furthermore, S.A.M. does not dispute that he was mentally ill nor that his initial commitment was justified. There is simply no evidence or description showing the extent to which any social stigma S.A.M. experiences is caused by his admittedly valid initial commitment, the serious mental health issues he experienced in the past, and the fact that he was recommitted for an additional six months. It is by no means a given that those in society who stigmatize S.A.M. for his mental health history will stigmatize him less if his recommitment order were reversed on appeal, only after the recommitment period has terminated. If we concluded that mere conjecture on social stigma was sufficient to overcome mootness, we would be forced to revisit many of our prior decisions. See,

10

e.g., Riesch, 278 Wis. 2d 24, ¶11 (holding that a parole revocation decision on the basis of an alleged failure to cooperate and violation of jail rules, among other offenses, was moot where the defendant was discharged from the underlying conviction and the revocation did not impact any of current condition of probation). Further, if S.A.M.'s position were adopted, the status of mootness as an effective legal doctrine in Wisconsin would be called into serious doubt.

¶52 Even if the merits of S.A.M.'s appeal should be addressed, as the majority accurately holds, his due process challenge to his recommitment order fails. Majority op., ¶¶28-29. Due process does not require that the County identify a particular subdivision paragraph of Wis. Stat. § 51.20(1)(a) (i.e., 2.a. through 2.e.). Procedural due process requires only "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action" and "an opportunity to present their objections." Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 13 (1978). S.A.M. does not contend that he was deprived the "opportunity to present . . . objections" prior to his recommitment. Id. In fact, he was appointed an attorney at state expense, who through motion practice and targeted cross-examination, provided S.A.M. a substantive defense at his recommitment hearing. Further, S.A.M. does not claim that the County failed to provide notice of its intention to pursue recommitment, its petition to the court, or the time, place, and manner by which recommitment would be determined. S.A.M. and his counsel were informed of

11

the County's charge that without commitment he would regress back to his prior "acute psychotic state and required hospitalization," thus requiring an extended commitment. They were also informed that the County would be proceeding under Chapter 51, and that the County believed if treatment were withdrawn S.A.M. would be the proper subject for commitment. Furthermore, S.A.M. was informed via court notice of the experts the County intended to rely on for in-court testimony, as well as the subject matter of the experts' testimony.

¶53 The County did not violate S.A.M.'s procedural due process rights in the civil commitment proceedings below. Compare DePiero v. City of Macedonia, 180 F.3d 770, 774 n.1, 788 (6th Cir. 1999) (holding that a ticket that cited to the wrong legal provision and did not include a notice of hearing, in conjunction with a summons mailed to the plaintiff of the time, place, and subject matter of a hearing, satisfied due process even though the plaintiff asserted that he never received the mailed summons); Cochran v. Ill. State Toll Highway Auth., 828 F.3d 597, 601 (7th Cir. 2016) (notice of "the date, time, and location" of a legal violation and the possibility of a hearing was sufficient for procedural due process); Herrada v. City of Detroit, 275 F.3d 553, 557 (6th Cir. 2001) (holding that a notice satisfied due process despite the fact that it contained false and misleading information on the legal consequences of the proceedings because the notice nonetheless "clearly state[d] that a hearing is available to contest the City's allegation that" the plaintiff committed a violation of law); see also

12

Milewski v. Town of Dover, 2017 WI 79, ¶21, 377 Wis. 2d 38, 899 N.W.2d 303 ("Although the text of the [United States] and Wisconsin constitutional provisions differ, they provide identical procedural due process protections."). If there were a legitimate concern as to what subdivision paragraph of Wis. Stat. § 51.20(1)(a) the County was proceeding under, a motion for more definite pleadings could be made. No such motion was made in the case at issue. Procedural protections already exist if there is confusion as to the basis for the recommitment. No record exists that such confusion was present here. Thus, due process does not require the County to more specifically identify the statutory subdivision paragraph under which it seeks a recommitment order.

¶54 I agree with the majority that the record demonstrates that both the third standard for dangerousness and the alternative recommitment standard for dangerousness were satisfied. See Wis. Stat. § 51.20(1)(a)2.c. & 1(am). Specifically, I agree with the majority that, based on the available record, S.A.M. would face "'a substantial probability of physical impairment or injury to himself' and that there is either no 'reasonable provision for [his] protection . . . available in the community' or that S.A.M. would not, to a 'reasonable probability,' 'avail himself . . . of these services.'" Majority op., ¶¶32, 34 (quoting § 51.20(1)(a)2.c.). Nonetheless, "if a question becomes moot . . . it will not be determined by the reviewing court" unless there exists "exceptional or compelling

13

circumstances." J-T Enters., 64 Wis. 2d at 701-02. This case is moot, and no collateral consequence sufficient to overcome mootness resulted from S.A.M.'s recommitment. Thus, the majority's discussion of the merits, while correct, is in this case unnecessary and ancillary to the damage done to the mootness doctrine.

¶55 The majority opinion essentially concludes that the mootness doctrine never applies in Chapter 51 proceedings. It does so without even requiring proof of an exception to mootness or any showing that there is a practical effect to S.A.M. The majority makes no effort to explain how S.A.M.'s circumstances are unique so to overcome mootness. The majority in fact does not in any way explain why S.A.M. is different from any other committee or recommittee. The majority creates a legal presumption that collateral consequences always result from a Chapter 51 commitment, and that the mootness doctrine is inapplicable in Chapter 51 commitments and recommitments. I disagree, and would conclude that the mootness doctrine, along with its exceptions, should remain a viable rubric when considering a case.

¶56 Finally, as for expedited disposition of Chapter 51 appeals, this court could address and fully vet any such proposal through administrative rulemaking. In such a hearing, the court could also consider whether the text of the Wisconsin Constitution and Wis. Stat. § 751.12(1) grant the court the authority to mandate any such expedited disposition. The court should not engage in that debate and conclude the outcome in

14

this opinion.  To the extent that the majority seeks to improve efficiency in Chapter 51 appeals, its decision today will have the polar opposite effect.  The majority's decision will flood the appellate system with otherwise moot cases because those cases too will have a firearms ban and have the potential for financial liability.  We can expect more, not less, delay and sometimes, justice delayed is justice denied.

¶57  For the foregoing reasons, I respectfully concur in part and dissent in part.

¶58  I am authorized to state that Justices PATIENCE DRAKE ROGGENSACK and REBECCA GRASSL BRADLEY join this writing.