COURT OF APPEALS
DECISION
DATED AND FILED

July 20, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP398-FT**

Cir. Ct. No. **2020ME392**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

IN THE MATTER OF THE MENTAL COMMITMENT OF D.J.P.:

WAUKESHA COUNTY,

    PETITIONER-RESPONDENT,

  V.

D.J.P.,

    RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Waukesha County: MARIA S. LAZAR, Judge. *Affirmed.*

¶1    GROGAN, J.[1] D.J.P. appeals from WIS. STAT. ch. 51 initial commitment orders that expired in February 2021.[2] D.J.P.'s only argument on appeal is that the County failed to submit sufficient evidence to prove he was dangerous under WIS. STAT. § 51.20(1)(a)2.b.[3] Pursuant to this court's April 5, 2022 order, the parties have submitted memorandum briefs. *See* WIS. STAT. RULE 809.17(1). Upon review of those memoranda and the Record, this court concludes the evidence was sufficient and therefore affirms.

¶2    The County argues this appeal is moot because D.J.P.'s initial commitment orders expired over a year ago, and he has not appealed from either of the two recommitments that have since been entered while this appeal was pending.[4] *See Portage County v. J.W.K.*, 2019 WI 54, ¶1, 386 Wis. 2d 672, 927 N.W.2d 509 (appeal of recommitment order moot where recommitment order appealed from had expired and new recommitment order had been entered). However, based on our supreme court's recent decision in *Sauk County v. S.A.M.*,

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] The initial orders subjected D.J.P. to inpatient treatment and involuntary medication. The circuit court found the County had proven by clear and convincing evidence that D.J.P. was mentally ill, a proper subject for treatment, and dangerous, pursuant to WIS. STAT. § 51.20(1).

[3] In arguing only that the evidence was insufficient to establish dangerousness, D.J.P. concedes he was mentally ill and a proper subject for treatment, which are the other two requirements the County must prove to involuntarily commit a person under WIS. STAT. § 51.20(1).

[4] The first recommitment occurred after a jury found D.J.P. mentally ill and dangerous, and D.J.P. stipulated to the second recommitment. He remains committed under the second recommitment order.

2022 WI 46, ¶¶3, 21-27, ___ Wis. 2d ___, 975 N.W.2d 162,[5] which held that S.A.M.'s appeal of an expired recommitment order was not moot due to the collateral consequences associated with the expired order, this court chooses to address the merits of D.J.P.'s argument. *See also* **Marathon County v. D.K.**, 2020 WI 8, 390 Wis. 2d 50, 937 N.W.2d 901 (concluding expired initial commitment is not moot even in the absence of an extension order because collateral consequences remain).

## I. BACKGROUND

¶3 On August 24, 2020, City of Waukesha Police were called to the home where D.J.P., who was forty-one years old, lived with his mother and father. D.J.P. got into a physical altercation with his parents that led to D.J.P.'s WIS. STAT. ch. 51 emergency detention. At the commitment hearing, the County presented testimony from a police officer, D.J.P.'s mother, and psychiatrists Dr. Cary Kohlenberg and Dr. Isha Salva.

¶4 The police officer testified that he was called to the P.'s home for a "disturbance call." The officer found a Kubotan—described as a "blunt striking instrument"—on D.J.P. and learned that D.J.P. had an argument with his parents. The officer testified: "There was some pushing. [Mrs. P.] fell down. I believe she injured her leg or hurt her leg and feared for her safety." The officer recalled a prior contact from the P.'s reporting concerns that D.J.P. was suicidal, though he could not recall the date or time of that call. The officer approved an emergency

---

[5] Specifically, **Sauk County v. S.A.M.**, 2022 WI 46, ¶¶3, 21-27, ___ Wis. 2d ___, 975 N.W.2d 162, concluded that the firearms ban and cost-of-care liability associated with S.A.M.'s expired recommitment order are sufficient consequences that have a practical effect even if a person is still under a subsequent recommitment.

detention based on the totality of circumstances because he was concerned for the safety of others.

¶5      Mrs. P. testified that she and her husband own the home and that D.J.P. and a younger son live in the home. She then recounted the altercation on August 24th that led to D.J.P.'s detention. She testified that D.J.P. was upset, "picked up the old grill," and "smashed it," though she added that it was an old, rusty grill. Then, she explained that D.J.P. pushed her husband "[j]ust a little bit" and "pushed his body up against my leg real hard." When asked how D.J.P. pushed her, she elaborated: "He kind of just pushed me with his whole body, and he pushed his whole body into me when I was sitting down because he wanted me to leave the house, because he told me to live with my sister." She testified that D.J.P. thought that he owned the P.'s house, which was not true. On cross-examination, Mrs. P. added that D.J.P. "threw his body into my legs because he was insisting that I leave the house." She also testified that conflicts with D.J.P. have "been ongoing" because he believed "people were poisoning him and following him and people were trying to cause an accident when he was in his car." She told the circuit court about an incident in which "he threw a chair" and "ruin[ed] a little piece of the floor in our kitchen" but qualified that the chair and floor were old and "falling apart anyway[.]" Mrs. P. testified she was afraid of D.J.P. based on the August 24th incident, that she feared for her safety, and that she was scared of D.J.P. when he pushed her.

¶6      Dr. Kohlenberg, who was appointed by the circuit court to evaluate D.J.P., testified at the final hearing that after reviewing the records and meeting "telephonically" with D.J.P., he concluded that D.J.P. suffers from a "treatable mental illness"—specifically, "unspecified psychotic disorder." He explained that D.J.P. is "highly delusional, with multiple bizarre and grandiose delusions[,]" in

addition to having "mood lability, including threatening verbal behaviors and physically threatening behaviors." When asked whether D.J.P.'s mental disorder "grossly impair[ed] his judgment, behavior, capacity to recognize reality, or ability to meet ordinary demands of life[,]" the doctor confirmed that it did. Dr. Kohlenberg believed D.J.P. was a proper subject for treatment as medication could, over time, "diminish and maybe eliminate his symptoms." When Dr. Kohlenberg attempted to discuss "medication options, risks or benefits or alternatives" and advantages and disadvantages, D.J.P. was incapable of maintaining the conversation or understanding.

¶7     When asked, Dr. Kohlenberg confirmed that D.J.P. is dangerous and "present[s] a substantial probability of physical harm to himself or others[,]" though he based the dangerousness opinion "on the original police report." On cross-examination, he testified that his main concern about D.J.P. being threatening or violent arose from D.J.P.'s delusions, which "could lead to more anger and potential violent actions to others," based on how a delusional D.J.P. responds to people he interacts with. Dr. Kohlenberg testified that if left untreated, D.J.P.'s delusions "can lead to worsening of delusions and anger and perhaps verbally and physically threatening behaviors and ultimately physically aggressive behaviors toward others that resulted from these delusions."

¶8     Dr. Salva, a psychiatrist involved in D.J.P.'s inpatient treatment since the emergency detention, had similar concerns about D.J.P.'s delusions—that his delusions could make him "feel[] threatened," which may cause him to "be the aggressor first[.]" When asked what evidence Dr. Salva had to show D.J.P. "feels threatened," she responded: "When he says that he's been tortured, he's been held prisoner, he's been tested upon, and he's been turned into a computer." She testified that D.J.P. needs to be kept in inpatient treatment until she could

"titrate up the medication," as the hope is the medication will reduce the delusions so they do not control his life and leave him unable to function.

¶9 The circuit court concluded that the County met its burden of proof and found D.J.P. to be "mentally ill[,]" dangerous, and a "proper subject for treatment[.]" It ordered D.J.P.'s involuntary commitment for six months, as well as involuntary medication and treatment. D.J.P. appealed the 2020 commitment orders.

¶10 Before these commitment orders expired, the County filed a petition seeking a twelve-month extension. D.J.P. requested a jury trial, and the jury found grounds existed for extension of his commitment. On February 24, 2021, the circuit court signed orders extending his commitment for twelve months.[6] D.J.P. did not appeal the 2021 orders.[7] Before the 2021 commitment orders expired, the County petitioned to extend D.J.P.'s commitment a second time with continued administration of medication. D.J.P. did not contest the petition, and on February 15, 2022, the circuit court ordered D.J.P. recommitted for nine months and continued the medication order. D.J.P. did not appeal the 2022 orders and is currently committed under them until November 2022.

---

[6] The 2021 extension orders subjected D.J.P. to treatment on an outpatient basis and administration of medication.

[7] The Record reflects that D.J.P. filed and was granted repeated orders to extend the time to file a postdisposition motion or notice of appeal. The Notice of Appeal D.J.P. eventually filed in March 2022 challenged only the 2020 commitment orders.

## II. DISCUSSION

¶11     D.J.P. challenges his 2020 initial commitment orders on the basis that there was insufficient evidence to establish he was dangerous.[8] The County responded that this case is moot without exception because his 2020 initial commitment orders expired in February 2021, and D.J.P. did not appeal his subsequent 2021 recommitment and did not even contest his 2022 recommitment. D.J.P. did not assert any exceptions to the mootness doctrine in his brief-in-chief but does in his Reply brief because after the County filed its brief, our supreme court issued its opinion in *S.A.M.*, holding that an appeal of an expired recommitment order is not moot where there are continuing collateral consequences such as a firearms ban and cost-of-care liability. *See S.A.M.*, ___ Wis. 2d ___, ¶3, 975 N.W.2d 162. Like the expired recommitment order in *S.A.M.*, D.J.P.'s expired initial commitment order contained a firearm prohibition that would "remain in effect until lifted by the court." Thus, although parties are generally not allowed to raise new issues in a reply brief, *see A.O. Smith Corp. v. Allstate Insurance Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) (raising an issue for the first time in a reply brief not allowed due to fundamental fairness principles), this court is bound to apply *S.A.M.* and will therefore consider the merits of D.J.P.'s appeal.

¶12     D.J.P. challenges only whether the County failed to present sufficient evidence to establish that he is dangerous. This court reviews a circuit court's findings of fact under the clearly erroneous standard, but independently

---

[8] In challenging only the dangerousness criterion, D.J.P. acknowledges the circuit court did not rely on what he asserts was double hearsay testimony introduced by the County when the psychiatrists testified they relied on the police report.

determines whether the facts satisfy the statutory standard. *See **Waukesha County v. J.W.J.***, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783.

¶13 WISCONSIN STAT. § 51.20(1)(a)2 identifies five standards by which the County may show an individual is dangerous. The circuit court here determined that D.J.P. was dangerous under § 51.20(1)(a)2.b, the second statutory standard, which requires, in relevant part, that the committed person:

> Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

¶14 The Record supports the circuit court's determination that D.J.P. met this dangerousness standard. First, as the circuit court explained, there was testimony that D.J.P. evidenced a substantial probability of physical harm to others. Mrs. P. testified about D.J.P. being physical with her and her husband on August 24th and about D.J.P.'s violent behavior. For example, D.J.P. physically pressed himself against his mother because he wanted her to leave the house, and Mrs. P. testified about D.J.P. smashing a grill, throwing a chair, and damaging the kitchen floor. Regardless of whether these items were old or falling apart, D.J.P.'s conduct evidenced violent behavior, and, smashing a grill and throwing a chair are concerning behaviors that have a substantial probability of causing serious physical harm. Moreover, the circuit court noted that the testimony supported the statutory requirement that others were in "reasonable fear of violent behavior and

serious physical harm[.]"[9] It was reasonable for Mrs. P. to fear that D.J.P. would engage in violent behavior and cause serious physical harm, particularly because he had already engaged in violent behavior by pushing hard against her and throwing physical objects. Although his conduct may not have caused her serious physical harm on August 24th, his actions certainly caused reasonable fear of him doing so. Proof of dangerousness under the second statutory standard, WIS. STAT. § 51.20(1)(a)2.b, "requires a showing that it is much more likely than not that the individual will cause physical harm to other individuals. This conclusion can be supported by evidence that at least one person was placed in 'reasonable fear of violent behavior and serious physical harm' to that same person or another." *D.K.*, 390 Wis. 2d 50, ¶42 (citation omitted). Mrs. P.'s testimony satisfied this requirement.

¶15    The WIS. STAT. § 51.20(1)(a)2.b standard is further supported by both psychiatrists' testimonies that D.J.P.'s unchecked delusions would lead to aggressive and violent behavior, thereby making him a danger to others. An aggressive, violent person would certainly cause others to reasonably fear they are at risk of serious physical harm. The circuit court's determination that the County proved by clear and convincing evidence that D.J.P. was presently dangerous is supported by sufficient evidence in this Record.

---

[9] D.J.P. contends that the circuit court ignored the "serious physical harm" part of the statutory standard or saw "reasonable fear of violent behavior" as an alternative to "serious physical harm[.]" Although the transcript does reflect that the circuit court, near the end of its oral ruling, expressed the standard as "a reasonable fear of violent behavior *or* serious physical harm," the transcript also reflects that, at the beginning of its oral decision, the circuit court accurately recounted the standard as conjunctive. (Emphasis added.) In any event, this court's review of the entire transcript demonstrates that the evidence supports that Mrs. P. had a reasonable fear of both violent behavior *and* serious physical harm.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.