**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 27, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2022AP122**

**STATE OF WISCONSIN**

Cir. Ct. No. 2015ME85

**IN COURT OF APPEALS
DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF J.M.K.:

MANITOWOC COUNTY,

　　PETITIONER-RESPONDENT,

　V.

J.M.K.,

　　RESPONDENT-APPELLANT.

　　　　　APPEAL from an order of the circuit court for Manitowoc County: ROBERT DEWANE, Judge. *Affirmed*.

¶1 KORNBLUM, J.[1] J.M.K.[2] was involuntarily committed to mental health treatment in 2015, pursuant to WIS. STAT. § 51.20, and recommitted several times since then. The current recommitment order was entered in October 2021. J.M.K. challenges that order. He argues that the evidence is insufficient to support the circuit court's finding of dangerousness and that the court failed to comply with the procedural requirements to make specific statutory findings pursuant to *Langlade County v. D.J.W.*, 2020 WI 41, ¶¶23-24, 391 Wis. 2d 231, 942 N.W.2d 277. We disagree and affirm.

## BACKGROUND

¶2 J.M.K. was involuntarily committed under WIS. STAT. § 51.20 in 2015,[3] based on severe delusional thinking and disturbing behavior. He was recommitted in 2015, 2016, 2017, 2018, 2019, and 2020.[4] Before the 2020 commitment would have expired on October 10, 2021, the County petitioned for recommitment. According to the petition for recommitment, even though J.M.K. had shown "some progress," he needed to show "a longer duration of stability." Specifically, according to the letter from Manitowoc County Human Services Department attached to the petition, "when [J.M.K.] is off commitment, he has stopped taking his medications and needed to be hospitalized."

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] We refer to the appellant in this confidential matter using his initials.

[3] J.M.K. had previously been committed in 2011. That commitment was allowed to expire, after extensions, in 2014.

[4] As both J.M.K. and the Manitowoc County note, recommitment hearings are referred to in the Wisconsin cases as both "extensions" and "recommitments," which refer to the same procedures. We refer to the hearings as "recommitments."

¶3     J.M.K. objected to the recommitment, and the circuit court held a hearing on that petition over two days.  The County presented testimony from two witnesses, Dr. Robert Rawski, an independent forensic psychiatrist, and Wayne Edmonds, J.M.K.'s case manager.   J.M.K. also testified on his own behalf. Rawski testified that he diagnosed J.M.K. with schizoaffective disorder, a mental illness, and that J.M.K. is treatable.[5]  J.M.K.'s mental illness requires "a good deal of medication to keep [his delusions] under control."  When asked whether J.M.K. had insight into his mental illness, Rawski's opinion was that J.M.K.'s insight was "partial."   Although J.M.K. can state that he has bipolar disorder (a previous diagnosis) "and he has had manic symptoms in the past and that the medications helped his manic symptoms," J.M.K. did not understand "all of the most important details regarding psychosis, erratic behavior and dangerousness from the detention paperwork [in 2015]" and an "episode of breakthrough symptoms in 2017." Rawski testified that J.M.K. denies ever discontinuing medication in the past, and believes that all of his hospitalizations have been voluntary.  Rawski testified that after J.M.K.'s original commitment from 2011 expired in 2014, J.M.K. was detained in 2015 after he was noncompliant with medications and the commitment was extended in 2017, another time when J.M.K. was noncompliant with medications.

¶4     Rawski testified that at the time he examined J.M.K., J.M.K. was functioning well, with support, in that he was living by himself in a supported living facility in a supervised apartment.  The record also shows that J.M.K. has a job and participates in community activities.  However, J.M.K. also receives

---

[5] J.M.K. had previously been diagnosed with bipolar disorder.  J.M.K. does not contest that he has a mental illness and that he is treatable.

supportive services of transportation, medication management, visits by the case manager twice a month, and daily programming.

¶5      Despite J.M.K. doing fairly well, Rawski still maintained that J.M.K.'s commitment needed to be extended based on J.M.K. missing some medication doses and lacking insight into how he could become dangerous if he stopped taking his medication. Rawski testified J.M.K. had missed four doses of medication, even using a medication dispenser. Rawski viewed missing four doses as a "big deal."[6] Although J.M.K. is competent to refuse medications, he needs to demonstrate continued progress and not go back to where he was in 2017, after he stopped taking medication. According to Rawski, J.M.K.'s main barrier is his lack of insight into what would happen if he stops taking medications. Rawksi could not articulate what would happen if J.M.K. becomes medication noncompliant. Rawski testified that if the medications were withdrawn, or J.M.K. stopped taking them, he would become dangerous as he had in the past:

> If the treatment were withdrawn, or even if some of the medications were reduced in dosage, which occurred in 2017 as well, his symptoms would escalate. And if he became fully noncompliant, his symptoms would likely become so severe—substantially likely to become so severe as they had in 2015 and again in 2011 that he would engage in dangerous behavior as a direct result of the delusions and the manic impulsivity that interferes with his judgment and has put others in fear for their safety, typically due to threats or, as I described, for the behaviors such as home invasions.

¶6      Based on these facts, Rawski agreed that J.M.K. was "currently dangerous under both the second and third standard." If his treatment were

---

[6] The record is not clear whether J.M.K. missed four doses or five. However, based on the testimony, the difference between missing four and five doses is not significant.

withdrawn or medication reduced, "he's more likely to threaten physical harm and put—because of his agitated and delusional state while manic and psychotic—that put other people in reasonable fear for their safety," which had occurred in 2017.[7] Rawski testified that J.M.K. was dangerous under the second standard because "[h]e was threatening violence in 2015 when he was noncompliant with medications." He met the third standard because when his judgment is impaired, "he's doing things that could get himself killed." In Rawski's opinion, J.M.K. is "substantially likely to become symptomatic and dangerous if he's noncompliant."

¶7     Rawski testified that J.M.K.'s lack of insight does not allow him to benefit from his previous experiences going off medication. J.M.K. is not yet at the point where he can make the "cost benefit analysis" of what happens if he stops taking his meds. To get J.M.K. over the goal line, he will need to "recognize the concrete association between taking your medications and being free to do what they want to do." J.M.K. needs to show "either an improvement in the insight which goes well beyond being able to talk about his past symptoms and dangerous behaviors, or ... consistently good judgment regarding treatment, even if that insight remains limited."

¶8     On cross-examination, Rawski was challenged as to whether he specifically asked J.M.K. if J.M.K. thought he might end up in the hospital if he stopped taking his medications. Rawski acknowledged that he did not ask this specific question, and that J.M.K. professes to want to continue the medications.

---

[7] Although Rawski testified that he could not definitively tie J.M.K.'s deterioration in 2017 to a decrease in medication due to inadequate records on whether the medication was reduced or stopped, the testimony of J.M.K.'s case manager, Edmonds, tied J.M.K.'s 2017 deterioration to a decline in medication, as discussed below.

However, Rawski testified that based on his experience, J.M.K.'s lack of insight shows a "remarkable intolerance of being able to even discuss and simply deny symptoms rather than acknowledge them and recognize the potential for them to result in dangerousness in the future if not adequately treated."

¶9 When Rawski was asked if it was his opinion that J.M.K. is "incapable at this point of making the connection between the impact of not taking his medications and being hospitalized as a result of not taking them," Rawski responded, "Yes." The most dangerous periods of time for J.M.K., in Rawski's opinion, occur when he is "both manic and psychotic." "[W]hen he is treated the mania subsides readily … whereas the psychotic delusions continue to persist for a much longer period of time and [it] is not clear that they ever truly dissipate altogether" but can be effectively treated.

¶10 Edmonds, the County case manager for J.M.K., also testified. He concurred with Rawski that J.M.K. currently leads "a fairly independent life in the community." Edmonds described J.M.K. as one of his "higher functioning clients" and as pretty independent. J.M.K.'s baseline is now "steadier." He seems to understand things when you talk to him. "This is the best I've seen him, to be honest." J.M.K. maintains his supported apartment, he's taking his medications "in a timely fashion," he goes to work, he is participating in a day program, occasionally working out at the YMCA, "and just making sure that he's doing all the right things but that his thinking primarily is as clear as possible in how he operates in the community." However, J.M.K. is not fully independent, as stated above. He has twice monthly visits from Edmonds and daily medication monitoring to ensure that J.M.K. has removed his medication from his dispenser. Daily monitoring ensures that if J.M.K. misses a dose, the County finds out immediately. Edmonds testified about the repercussions of J.M.K. not taking

medications. In 2014, when J.M.K. was living on his own, he did not take his medication and decompensated tremendously. He engaged in property destruction in the apartment, for which he continues to pay. In 2017, Edmonds personally observed J.M.K.'s decompensation when he stopped taking medication. Edmonds testified, J.M.K. "was taking his medications and he wasn't." J.M.K. denied to Edmonds that he had stopped taking the medication. The County then did labs to confirm that J.M.K. had stopped taking his Depakote, a mood stabilizer. This experience has led to daily medication monitoring as well as lab tests for J.M.K.

¶11 Edmonds testified that this past year, J.M.K. missed his medications four or five times. This concerned Edmonds, because J.M.K. "just hasn't reached the level of insight where he understands the urgency when he misses his meds." On the surface, J.M.K. can articulate why missing medication is bad, "but you don't feel the sense of urgency." In Edmonds' experience, when J.M.K. decompensates, he "decompensates quickly and you can really see it in terms of how manic he becomes and then he becomes, you know, kind of threatening, intimidating, grandiose, all the things that Doctor Rawski mentioned. And I mean, you see it quickly." Edmonds does not believe that J.M.K. understands the full scope of how dangerous he becomes when he is symptomatic.

¶12 Although J.M.K. would still be able to receive services from the County, including the medication dispensing machine, if the commitment expired, this would not be sufficient, in Edmonds' opinion. For Edmonds, "[i]t's not about the machine." It's the level of insight and if J.M.K. can "sustain consistency over time" that "indicates that he's gotten over the hump." Edmonds testified that J.M.K. would need to take all doses of medication and never miss to demonstrate this level of safety.

¶13    J.M.K. testified on his own behalf that that he is currently taking medications.  He could recite his medications and stated that he "[a]bsolutely" will continue taking medication even if the commitment expires "[b]ecause [his] mental illness … needs to be treated for the rest of [his] life."  He verbally committed to continuing services and stated he would never be "dangerous ever again."  J.M.K. also explained that he is a totally different person now.

¶14    The court made its findings and orders after hearing the testimony and reviewing the treatment records.  Although the circuit court was impressed by J.M.K.'s progress since the last time J.M.K. was in court, the progress was not sufficient to avoid another extension of the commitment.  The court stated that it was continuing the commitment for another year based on J.M.K.'s entire treatment record, not just his recent history.  The court found that J.M.K. was not dangerous as long as he is taking his medications.  However, the court was mainly concerned that J.M.K. did not believe he would be dangerous if he did not take his medications.  The court told J.M.K. that J.M.K. needs to be able to say that he knows he will be dangerous if he stops taking medications, "[b]ecause your treatment record tells me that that would be the case."  The court made findings of dangerousness as "manifested or shown by a substantial likelihood that based on his individual treatment record" J.M.K.'s dangerousness "is likely to be controlled with appropriate medication administered on an outpatient basis and he has been committed previously to mental institution."

¶15    After the circuit court made its findings, the county asked for specific findings of dangerousness pursuant to WIS STAT § 51.20(1)(a), 2.b. and c.  J.M.K.'s attorney requested a single finding under subsection (b), and the court made that finding.  The County also agreed to limit the finding to one subsection.  This appeal followed.

## DISCUSSION

*Standard of Review*

¶16    In a proceeding under WIS. STAT. ch. 51, the County has the burden to prove three things by clear and convincing evidence:   (1) that a subject individual is mentally ill; (2) a proper subject for treatment; and (3) dangerous. *See* WIS. STAT. § 51.20(1)(a), (13)(e*)*; ***Sauk County v. S.A.M.***, 2022 WI 46, ¶4, ___ Wis. 2d ___, 975 N.W.2d 162.   The Wisconsin Supreme Court recently summarized the five standards for dangerousness.  ***Id.***  The two relevant standards here are the second and the third:

> • Second Standard: there is a substantial probability of physical harm to others evidenced by recent homicidal or other violent behavior, or a recent overt act, attempt or threat to do serious physical harm that placed others in reasonable fear of serious physical harm;

> • Third Standard: there is a substantial probability of physical impairment or injury to one's self or others evidenced by a pattern of recent acts or omissions manifesting impaired judgment, and there is either no reasonable provision for one's protection in the community or a reasonable probability that one will not avail himself or herself of those services.

***Id.*** In a case of recommitment, the proof may differ:

> Recommitment proceedings can differ from initial commitment proceedings in one significant way.  In an initial commitment proceeding, the government may prove dangerousness only with evidence of recent acts, omissions, or behavior.  In a recommitment proceeding, though, the government may alternatively prove dangerousness by "showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment [under one of the five dangerousness standards] if treatment were withdrawn."  [WIS. STAT.] § 51.20(1)(am).

*S.A.M.*, ___ Wis. 2d ___, 975 N.W.2d 162., ¶5 (first alteration in original).

¶17     "Whether the County presented clear and convincing evidence to justify recommitment is a mixed question of fact and law." *Id.*, ¶17. As explained in *D.J.W.*, 391 Wis. 2d 231, ¶¶23-24, we "will uphold a circuit court's findings of fact unless they are clearly erroneous. A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." *D.J.W.*, 391 Wis. 2d 231, ¶24. In addition, we examine the question of whether the facts meet the statutory standards in WIS. STAT. § 51.20 as a question of law, independent of the circuit court's findings. *D.J.W.*, 391 Wis. 2d 231, ¶25.

*Sufficiency of the Evidence to Show Dangerousness*

¶18     J.M.K. argues that the evidence is insufficient to prove that he is currently dangerous. We disagree. "[A]n individual [facing recommitment] may still be dangerous despite the absence of recent acts, omissions, or behaviors exhibiting dangerousness outlined in [WIS. STAT.] § 51.20(1)(a)2.a-e." *Portage County v. J.W.K.*, 2019 WI 54, ¶24, 386 Wis. 2d 672, 927 N.W.2d 509.

¶19     The evidence in this case supports the circuit court's findings of dangerousness. Rawski, a board certified forensic psychiatrist, testified that J.M.K. is dangerous based on the second and third standards. He based his opinion on the treatment records, testifying that but for the treatment that J.M.K. is receiving, he would be dangerous. Both Rawski and case manager Edmonds testified about the multiple supports that J.M.K. receives to ensure that he takes his medication, which is central to J.M.K.'s treatment. The medication is dispensed from a machine and his medication compliance is monitored daily. J.M.K. also undergoes lab tests to verify that he is taking the medication. J.M.K. decompensates quickly when he stops taking medication. Even with the dispenser

and the daily checks, within the past year, J.M.K. had missed at least four or five doses of psychotropic medication.

¶20 Both Rawski and Edmonds testified about their concern over J.M.K.'s missing medication. The County presented specific examples of how J.M.K. became dangerous when he stopped taking medication in 2015 and 2017. Regarding 2017, Edmonds testified about a time when J.M.K. stopped taking his mood stabilizer and things "fell apart." Edmonds was only able to determine the cause by blood tests because J.M.K. denied stopping the medication. Edmonds testified that when J.M.K. deteriorates, it happens very quickly. He becomes very dangerous when he is symptomatic. Based on his experience with J.M.K., Edmonds believes that J.M.K. does not understand the full scope of how dangerous he becomes when he is symptomatic.

¶21 Rawski also testified about J.M.K.'s deterioration in 2017. A psychiatrist examining J.M.K., Dr. Marshall Bales, felt so threatened by J.M.K. that he terminated the interview because he was in fear of his safety. J.M.K. "was acutely psychotic and was hostile toward Dr. Bales, telling him he could read his mind and that Dr. Bales thought he was stupid." During the interview for this proceeding, J.M.K. denied to Rawski that the incident with Bales ever took place and denied that he has ever been psychotic or dangerous. J.M.K. denied ever reducing his medications in the past, even though this was verified by lab tests. He denied being hospitalized involuntarily.Rawski testified that J.M.K. still lacks insight into the consequences of stopping medication.

¶22 Our review of the record shows that that circuit court did not erroneously exercise its discretion when it found J.M.K. dangerous under the two

stated standards, plus the additional standard for recommitment, and J.M.K. meets the standards for recommitment.

*Specific Findings Under the Statute*

¶23 J.M.K. further contends that the circuit court erred in not making the requisite "specific factual findings with reference to the subdivision paragraph of [WIS. STAT.] § 51.20(1)(a)2. on which the recommitment is based." *See D.J.W.*, 391 Wis. 2d 231, ¶59. J.M.K. also argues that the circuit court, after the hearing, simply "ticked" a checkmark on the order and did not actually make factual findings.

¶24 The record is clear that after the court made the factual findings that J.M.K. met the criteria for dangerousness through its narrative, it made the specific statutory findings under WIS. STAT. § 51.20(1)(a)2.b. after discussion with the County and counsel for J.M.K.

¶25 J.M.K. first argues that the circuit court actually concluded that he did not meet the criteria for dangerousness, implying that we should ignore anything the circuit court said afterward.

¶26 The court began its findings by stating:

> As I look at, you know, the statutory language, in terms of the manifestation of his dangerousness, it has to be one of four things; it has to be a recent overt act, attempt or threat to act, as defined by statute. And that's not what's being alleged. It's not what's being alleged because it hasn't happened. It has to be a pattern of recent acts or omissions as defined by statute and that's not what we're talking about. [J.M.K.] does what he's supposed to do. Recent behavior, as defined by statute, that's not what we're talking about. Everybody agrees, [J.M.K.] isn't dangerous as long as he's taking his medications. And he's been taking his medications.

¶27    While it is true that court initially stated that J.M.K. did not meet any of the statutory criteria under WIS. STAT. §51.20(1)(a)2., the context of the court's statement shows that the court was just beginning its analysis.  The court went on to explain that under the law, a lack of a recent overt act did not preclude a finding of dangerousness.  *See **D.J.W.***, 391 Wis. 2d 231, ¶32 (quoting WIS. STAT. § 51.20(1)(am)).  We have no requirement in Wisconsin that a court is not allowed to explain how it makes its findings or how it gets from point "a" to point "b."  The court's first word was not a promise to J.M.K. that it would not make further findings and conclusions.  In this case, the court explained what it meant and made very specific findings of dangerousness based on J.M.K.'s record.    After reviewing the evidence, the court explained:

> So the Court will find that grounds for the extension of the commitment have been established....  The Court is going to find that [J.M.K. is] dangerous, as defined by statute, and that his dangerousness is manifested or shown by a substantial likelihood that based on his individual treatment record—and the Court wants to stress that it's based on his record, not his recent progress—that [J.M.K.] would be a proper subject for treatment if commitment were withdrawn.

¶28    We conclude that the court's first words must be taken in context of its entire statement of findings and find no error.

¶29    J.M.K. next argues that the circuit court erred in making the requisite statutory findings after it made narrative findings and filling out the CCAP form reflecting those findings.[8]  J.M.K. appears to believe that the statutory findings

---

[8] This form is ME-911, 04/21 Order of Commitment/Extension of Commitment/Dismissal, which can be found at https://www.wicourts.gov/forms1/circuit/ccform.jsp?FormName=&FormNumber=&beg_date=&end_date=&StatuteCite=&Category=24 (last visited July 18, 2022).

must be verbally integrated with other findings to be valid. In other words, the court should have re-explained its findings, lining up its words with the statute. Again, we find no error in the court's procedure. After the court concluded its oral findings, the County then requested specific factual findings under WIS. STAT. § 51.20(1)(a)2.b. and c. The court and attorneys discussed which subsection to use, and the court made the findings under 2.b, with agreement of the parties. At no point did J.M.K.'s counsel request that the court make its verbal findings over again.

¶30    We decline to interpret *D.J.W.* to require such a narrow, formalistic approach. *D.J.W.* requires only that the circuit court make "specific factual findings with reference to the subdivision paragraph of [WIS. STAT.] § 51.20(1)(a)2. on which the recommitment is based." *D.J.W.*, 391 Wis. 2d 231, ¶59. *D.J.W.* does not require that the court make its findings in any particular order. The court satisfied the requirements of *D.J.W.* The record is clear that the court made the statutory findings, which the evidence supports.

## CONCLUSION

¶31    In conclusion, we affirm the circuit court's order recommitting J.M.K. pursuant to WIS. STAT. § 51.20.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

14