**COURT OF APPEALS
DECISION
DATED AND FILED**

**August 23, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| **Appeal No. 2023AP200** | **Cir. Ct. No. 2022ME189** |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS DISTRICT II** |

IN THE MATTER OF THE MENTAL COMMITMENT OF J.L.C.:

WINNEBAGO COUNTY,

    PETITIONER-RESPONDENT,

  V.

J.L.C.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Winnebago County: TERESA S. BASILIERE, Judge. *Affirmed*.

¶1    GROGAN, J.[1]  J.L.C. appeals from WIS. STAT. ch. 51 commitment and involuntary medication orders.  He seeks reversal of these orders and requests that this court remand the matter to the circuit court to vacate the orders.  He makes two arguments.  First, he contends that because he is under a guardianship wherein WIS. STAT. ch. 55 protective placement/services could meet his needs, he cannot be found to be dangerous under WIS. STAT. § 51.20(1)(a)2.d or 2.e, both of which contain the "ch. 55 exclusion" therein.  Second, he argues Winnebago County's lawyer made improper statements to the jury during the rebuttal closing argument.  Specifically, he contends the County's lawyer relied on facts not in evidence, commented on his own personal experiences, and made remarks that shifted the burden to J.L.C.  He asserts these comments so infected the proceeding that they amounted to a denial of due process.  This court rejects J.L.C.'s arguments and affirms.

## I.  BACKGROUND

¶2    J.L.C. is sixty-eight years old and serving a lengthy prison sentence.[2] He is housed at the Wisconsin Resource Center due to his mental health issues.  J.L.C. was diagnosed with schizophrenia in 1995 or 1997 and since that time has been the subject of numerous WIS. STAT. ch. 51 commitments.  His last ch. 51 commitment expired in April 2022.  J.L.C. has also had a guardian since June 2020 to address his physical health and "for the medical procedures[.]"  He

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22).  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2]  In 1989, a jury found J.L.C. guilty of two counts of attempted first-degree homicide, and he was sentenced to serve twenty-five years on each count.

has prostate cancer, "some visual impairment on his eyes[,]" a traumatic brain injury, and hyperlipidemia.[3]

¶3      In June 2022, the County filed a petition seeking a WIS. STAT. ch. 51 examination, alleging that J.L.C. has a mental illness, is a proper subject for commitment, and is dangerous.  After resolving a venue dispute,[4] the circuit court appointed two doctors to examine J.L.C.—Dr. Yogesh Pareek and Dr. J.R. Musunuru.  Dr. Pareek examined J.L.C. and concluded he has a mental illness, is a proper subject for commitment, and is dangerous.  Dr. Musunuru attempted to examine J.L.C., but J.L.C. became angry and refused to cooperate.  Based on J.L.C.'s records, Dr. Musunuru also concluded that J.L.C. has a mental illness, is a proper subject for commitment, and is dangerous.

¶4      J.L.C. requested a jury trial, which occurred in August 2022.  Before the trial, there was some discussion about whether J.L.C.'s guardianship obviated the need for the WIS. STAT. ch. 51 commitment.  The discussion arose because the dangerousness standards the County relied upon provide that a subject is not dangerous if the subject can obtain "protective placement or protective services under ch. 55."  *See* WIS. STAT. § 51.20(1)(a)2.d, e.  Although it is undisputed that J.L.C. has been appointed a guardian, there was some dispute about whether his

---

[3] According to trial testimony, hyperlipidemia means "[e]levated lipids, elevated cholesterol and triglycerides."

[4] Because J.L.C. is housed at the Wisconsin Resource Center in Winnebago County, corporation counsel argued Winnebago is the proper venue.  J.L.C. filed a motion contending that this commitment should occur in Waukesha County, where he resided before he was imprisoned. Waukesha County filed a response asking the circuit court to deny J.L.C.'s motion.  Before the circuit court decided the motion, J.L.C. withdrew it.  Venue is not raised as an issue on appeal, and this court will not address it.  *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("an issue raised in the trial court, but not raised on appeal, is deemed abandoned").

guardianship involved placement or services under ch. 55 or was simply a guardianship under WIS. STAT. ch. 54. Moreover, J.L.C.'s treating doctor from the Wisconsin Resource Center, Dr. George Monese, testified at the probable cause hearing that J.L.C.'s appointed guardian cannot authorize the psychotropic medication that J.L.C. needs to control his schizophrenia.

¶5    At a subsequent hearing, the circuit court again asked whether the WIS. STAT. ch. 51 commitment was necessary if J.L.C. has a guardianship in place. J.L.C.'s lawyer conceded that a guardian typically does not have the power to authorize psychotropic medication but argued that the guardian could petition for protective services to obtain that medication order. The County's lawyer responded that without a protective placement order, the ch. 51 commitment is necessary. A complicating factor appeared to be that J.L.C. is an inmate serving a criminal sentence. The circuit court found that, despite the existing guardianship, the ch. 51 commitment could proceed.[5]

¶6    At the jury trial, the County called three witnesses to testify. First, Dr. Pareek told the jury that, after he reviewed J.L.C.'s medical records and examined him, he concluded that J.L.C. has the mental illness of schizoaffective disorder, which is a thought, mood, and perception disorder, and that J.L.C.'s impairment is "[s]evere." Dr. Pareek testified that J.L.C. is dangerous under the second (WIS. STAT. § 51.20(1)(a)2.b) and fifth (§ 51.20(1)(a)2.e) dangerousness standards. The doctor testified that J.L.C. said that J.L.C. "is going to kill black

---

[5] The court commissioner presiding over the probable cause hearing made a similar finding: "The parties essentially stipulated that [J.L.C.] is on a guardianship, which should be under Chapter 54. The Court has not been provided evidence that [J.L.C.] is currently on a Chapter 55 order for protective placement or protective services."

4

people" with a "machine gun[.]" He also testified that J.L.C. refuses medications because "he does not believe that he needs any treatment." Dr. Pareek opined that without treatment, J.L.C. will substantially deteriorate and pose a substantial risk to himself and others. The doctor emphasized that when someone has a "severe mental illness," does not "understand the need for treatment," and "is threatening to kill somebody, that is dangerous."

¶7      The second witness to testify was Judith H. Roberts, J.L.C.'s advanced practice nurse prescriber at the Wisconsin Resource Center. She testified that J.L.C. has been prescribed medications for his prostate cancer, hyperlipidemia, and acid reflux, but he does not take the medications. She explained that the cancer is causing him pain, but he refuses treatment because he denies that he has cancer. She also testified that he has schizophrenia, for which he is given an antipsychotic injection that he would refuse but for the court order. Roberts was aware that J.L.C. had a guardianship in place "for the medical procedures[.]" She acknowledged a progress note she wrote on November 2, 2021, that J.L.C. denied "any urges or plans to self-harm or hurt others." She also confirmed that he does not want to take any medications, that he claims the medications do not help, that the "voices will never stop," and he does not "want to see any more doctors[.]"

¶8      The County's final witness was Dr. Monese, a psychiatrist at the Wisconsin Resource Center who has been treating J.L.C. since 2009. Dr. Monese testified that J.L.C. "suffers from a major mental illness[,]" namely schizophrenia, which "was complicated by traumatic brain injury that happened in 2013 at the height of his psychosis[.]" The doctor testified that the schizophrenia is a "[d]isorder of thought, mood, and perception[,]" which severely impairs J.L.C. "if not under treatment." He testified that this mental illness severely impairs J.L.C.'s

5

judgment and grossly impairs his behavior. He told the jury that J.L.C.'s ability to recognize reality is "[g]rossly impaired when not under treatment" and that he recently evidenced a probability of harming others when J.L.C. threw urine at others. Recently, Dr. Monese heard J.L.C. threaten to kill himself and that "if he had some weapon he would do that and die." He also testified that when unmedicated, J.L.C. made "specific threats" that required him "to be placed in [a] high management unit" and was seen on videos threatening others and creating danger to himself and others when staff needed to obtain a blood sample from him.

¶9     Dr. Monese also told the jury about J.L.C.'s other physical ailments, which include a "frontal bone fracture and disruption of his eye vision on the right, causing him traumatic cataract[,]" prostate cancer, "elevated lipids[,]" and "severe acid reflux." He explained that even though J.L.C. has been prescribed medication to help with these things, he will not take the medications because he denies having any of these medical conditions and instead believes the medication being administered to treat his schizophrenia is the cause of all his symptoms.

¶10    The doctor explained that schizophrenia cannot be cured, but it is treatable, and the medication used to treat J.L.C. has reduced his symptoms and provided "therapeutic value[.]" Without treatment, Dr. Monese testified that J.L.C.'s probability of deteriorating "is extremely high[.]" He further opined that when J.L.C. "was off treatment," he "became extremely psychotic and agitated, … necessitating placement in high management unit. His physical conditions continued to deteriorate." Dr. Monese testified that the psychotropic medications may not eliminate J.L.C.'s hallucinations and delusions, but the medication attenuates or lessens them.

¶11  When asked about the guardianship in place, Dr. Monese explained it was obtained "to make sure that we have the authority to take him to the hospital, perhaps against his will" and to "manage[] his medical conditions as effectively as possible[.]"  The doctor was shown the guardianship paperwork, which was admitted into evidence.  When asked whether the "guardian has the authority to consent to medication for [J.L.C.]," Dr. Monese responded that the guardian's authority was "[f]or physical conditions only."  After Dr. Monese's testimony, the County rested its case.

¶12  J.L.C.'s lawyer then told the circuit court J.L.C. did not want to testify on his own behalf.  When the circuit court addressed J.L.C. directly to confirm he did not want to testify, J.L.C. initially confirmed that his lawyer had discussed his right to testify and that his lawyer told the court he decided not to testify.  But when the court specifically asked J.L.C. if he understood it was his "sole decision" as to whether he wanted to testify, J.L.C. said he did not understand.  When the court asked:  "Do you understand that it is your decision alone whether you decide to testify or not?" J.L.C. responded, "No."  When the court asked J.L.C. whether he was "making the decision not to testify freely and voluntarily[,]" he again responded, "No."  J.L.C. then told the court he wanted "to say one thing."  He said:  "I have been drinking water that's bitter."  He also told the court, "I think that the water has wormwood in it.  When I drink it, it's bitter.  And it goes to my kidneys, and I get pain."

¶13  The circuit court again asked J.L.C.'s lawyer if the lawyer felt J.L.C. "sufficiently understands the decision on testifying[.]"  His lawyer responded that J.L.C. "consistently stated he does not want to talk to everyone today."  The court found J.L.C. decided not to testify and proceeded to give jury instructions, and both lawyers thereafter gave closing arguments.

¶14    The County argued first and recounted the testimony of its three witnesses.  It asked the jury to find that J.L.C. has a mental illness, is a proper subject for treatment, and is dangerous.  J.L.C.'s lawyer argued next and conceded that J.L.C. has a mental illness but argued that he was not a proper subject for treatment because schizophrenia cannot be cured and that the treatment J.L.C. is receiving does not eliminate his delusions or hallucinations.  Then, J.L.C.'s lawyer focused on the guardianship and argued that J.L.C. "is not at risk of death or serious physical injury when he has a guardian appointed by the court to give him these services, to make sure he sees a urologist, to make sure that his blood gets sent in, to make sure he gets treatment.  That is what the guardian is there for." J.L.C.'s lawyer then argued that the fourth and fifth dangerousness standards have not been met because both of those standards say that if J.L.C. "may be provided protective placement or protective services under 55[,] … then he is not dangerous."  J.L.C.'s lawyer continued:

> But what does that mean?  So, obviously, I don't have the burden today.  Corporation Counsel has the burden to prove everything to you.  And it notes here if he may be provided these services -- not if he currently has them -- if he may get these services, then he is not a harm to himself or others.  So what are these services?  How can he get them?  Well, Corporation Counsel hasn't provided that to you today.  It's their burden to show that, no, he can't get these protective placements, no, he can't get these protective services.  It is their burden to tell you that he can't get them.  And they didn't tell you that at all.  Because he has a guardian that can provide protective services for him.

¶15    In its rebuttal closing, the County emphasized that the evidence showed J.L.C. was a proper subject for treatment and dangerous and then responded to J.L.C.'s closing remarks about the guardianship:

> But there is an implication here that somehow I haven't provided you with enough information to show that he is dangerous.  I don't believe that.  I don't believe that I have

> any duty to come in here and bring a social worker in here and do a separate report for protective services or placement. That is not what it means to carry the burden. My job is to show that he is dangerous to himself or others. And that is exactly what the doctors here did. You have not heard anything about the feasibility of protective services. We haven't heard anything about the feasibility of protective placement. I would know because I do those. I do those in addition to the 51s. And, if anything, that would be a witness for the defense to bring in. They could just as easily bring that person and ask them. That's not what I'm saying we're here for today. I'm saying we're here today because the elements of the D and E Standard of dangerousness, on their face, are met.
>
> But, since … the defense brings it up, let me explain to you why protective services and placement aren't a possibility, or this is all per statute. It's not my opinion.
>
> The first thing is that 55.12(2) disallows that --

When J.L.C.'s lawyer objected to these comments, the circuit court responded that because this was closing argument, it was "going to give a little leeway." The County's lawyer continued:

> [Section 55.12(2)] [d]isallows commitment to a treatment care facility. That is exactly what the Wisconsin Resource Center is. So then we ask, is protective services a possibility? Well, some practical reasons why they're not. Certainly, it is difficult for any county to provide services for individuals in the prison. But more so, let me quote this other statute, 55.23(1). Patients' rights include freedom from physical restraint and isolation, access to a telephone, wearing one's own clothes, privacy in bathing and toileting[.]

J.L.C.'s lawyer objected a second time, asserting: "This is all beyond the scope, and it is nothing that has been testified to today." The circuit court responded, "This is statutory. It is the law." The court overruled the objection, and the County concluded its argument:

> And these aren't things I'm making up. These are all practical reasons why a protective placement just wouldn't work. The state prison system has an inherent and

9

overwhelming interest in the security of not only the people that work there, but the people that live there, the other inmates. And it really is at odds with what the defense here is suggesting we should do. It just can't be done.

¶16 The jury returned a verdict finding that J.L.C. has a mental illness, is a proper subject for treatment, and is dangerous under both the fourth and fifth dangerousness standards. *See* WIS. STAT. § 51.20(1)(a)2.d, e. The circuit court rejected J.L.C.'s motion for judgment notwithstanding the verdict. The court ordered J.L.C. committed for six months and also entered an involuntary medication order for the same time period. J.L.C. now appeals.

## II. DISCUSSION

¶17 J.L.C. contends that his guardianship prevents him from being dangerous under the fourth and fifth dangerousness standards in WIS. STAT. § 51.20(1)(a)2.d and 2.e. Section 51.20(1)(a)2.d provides as material:

> *No substantial probability of harm under this subd. 2. d. exists* if reasonable provision for the individual's treatment and protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services, *if the individual may be provided protective placement or protective services under ch. 55*[.]

(Emphases added.) Section 51.20(1)(a)2.e provides as material:

> The probability of suffering severe mental, emotional, or physical harm is *not substantial under this subd. 2. e.* if reasonable provision for the individual's care or treatment is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services or *if the individual may be provided protective placement or protective services under ch. 55*.

(Emphases added.)

¶18    J.L.C. contends that the County failed to prove the WIS. STAT. "Ch. 55 exclusion" and that because his case involved findings of dangerousness under the fourth and fifth standards, the County had to prove his needs could not be met by a ch. 55 protective placement. *See Dane County v. Kelly M.*, 2011 WI App 69, ¶18, 333 Wis. 2d 719, 798 N.W.2d 697. He points out that he already has a guardianship and that his guardian could seek protective services for him, making a WIS. STAT. ch. 51 commitment unnecessary.

¶19    The County responds that the evidence specific to this case showed that a WIS. STAT. ch. 55 protective placement/services would not have met J.L.C.'s needs, and he was not subject to or eligible for ch. 55 protective placement/services. It further asserts that the jury heard all the evidence, including instructions about the ch. 55 exclusion, and still found that J.L.C. was a proper subject for the WIS. STAT. ch. 51 commitment.

¶20    This court concludes it need not resolve this argument because resolving it would have no practical effect on the underlying controversy. *See Portage County v. J.W.K.*, 2019 WI 54, ¶11, 386 Wis. 2d 672, 927 N.W.2d 509. This is so for several reasons. First, the six-month commitment orders under review in this initial commitment expired in February 2022. J.L.C. is no longer subject to these orders. And, although our supreme court concluded in *Marathon County v. D.K.*, 2020 WI 8, ¶25, 390 Wis. 2d 50, 937 N.W.2d 901, that appeals from expired initial commitment orders are not moot because of collateral consequences such as a firearms ban, that circumstance does not apply here for two reasons. First, J.L.C. is also subject to a firearms ban under his guardianship order. So, even if this court were to vacate the orders in this appeal, the firearms ban remains under the guardianship order. Second, J.L.C. has been incarcerated for more than three decades after having been convicted of two counts of

11

attempted first-degree murder, and as a convicted felon, he is prohibited from possessing firearms. *See* WIS. STAT. § 941.29.

¶21 Additionally, we note that in a footnote in his brief-in-chief, J.L.C. asserts: "in *Sauk* [*County*] *v. S.A.M.*, 2022 WI 46, ¶¶24-27, 402 Wis. 2d 379, 975 N.W.2d 162, the supreme court held that appeals from expired commitment orders are *never* moot due to their continuing collateral consequences." (Emphasis added.) Never is a strong word and one that the supreme court did *not* use in deciding *S.A.M.* Rather, the supreme court concluded that when an appellant subject to an expired "recommitment order" asserts that "ongoing collateral consequences causally related to [the expired recommitment order] could be practically affected by a favorable decision," the appeal is not moot. *Id.*, ¶37.

¶22 J.L.C. does not identify any ongoing collateral consequences causally related to the expired initial commitment order in this appeal. He has been imprisoned since his conviction for attempted first-degree homicide in 1989 and is banned from possessing firearms under both the guardianship and the convicted felon statute. Accordingly, any decision on this particular expired initial commitment order is moot.[6]

     *By the Court.*—Orders affirmed.

     This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[6] Because this court concludes J.L.C.'s appeal is moot, it is not necessary for this court to address his second issue with respect to the County's alleged improper rebuttal closing argument remarks.