COURT OF APPEALS
DECISION
DATED AND FILED

April 16, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1695-FT**

STATE OF WISCONSIN

Cir. Ct. No. 2023ME2

IN COURT OF APPEALS
DISTRICT III

IN THE MATTER OF THE MENTAL COMMITMENT OF C. R. J.:

MARINETTE COUNTY,

PETITIONER-RESPONDENT,

V.

C. R. J.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Marinette County: JAMES A. MORRISON, Judge. *Reversed*.

¶1    STARK, P.J.[1] Caleb[2] appeals an order for his involuntary commitment pursuant to WIS. STAT. § 51.20 and an order for his involuntary medication pursuant to WIS. STAT. § 51.61(1)(g).  Caleb argues that the circuit court erred by failing to make specific factual findings regarding his dangerousness and that Marinette County presented insufficient evidence to prove that he was dangerous pursuant to either § 51.20(1)(a)2.a. or b.

¶2    We conclude that the circuit court failed to make any specific factual findings regarding how Caleb evidenced a substantial probability of harm to others as required under WIS. STAT. § 51.20(1)(a)2.b.  We assume without deciding that the court made sufficient factual findings regarding Caleb evidencing a substantial probability of harm to himself under § 51.20(1)(a)2.a.  However, we conclude, as a matter of law, that the County presented insufficient evidence to support those findings.  Accordingly, we reverse.

## BACKGROUND

¶3    In December 2022, Caleb was arrested and brought to jail for disorderly conduct after an incident in which Caleb was "acting odd, swearing, yelling, [and] talking about vampires and werewolves" at an inn.  While in custody, Caleb was "yelling, screaming," and "throwing things in his cell."[3]  Due

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2021-22). This is an expedited appeal under WIS. STAT. RULE 809.17 (2021-22).  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] For ease of reading, we refer to the appellant in this confidential manner using a pseudonym, rather than his initials.

[3] There is nothing in the record stating that Caleb was "throwing things" in a manner that could have hurt himself or others, nor does the record state Caleb's yelling was directed at any particular person.

to concerns for Caleb's safety and welfare, a crisis worker, Cheryl Bowman, was called to assess him. Caleb would not interact with Bowman and continued to yell. Bowman then requested that Caleb be brought to a hospital to see if there were medical reasons for his behavior.

¶4    Upon arriving at the hospital, Caleb calmed down. He was in handcuffs in the presence of two deputies in the emergency room, and Bowman was able to assess him. The crisis assessment report prepared by Bowman states:

> This writer asked [Caleb] if he was suicidal[;] he stated no. [Caleb] then stated[,] "Just shoot me, get it over with so my sons can take over [the] Garden of Eden…. I will not tell you who I am, but I am in the [B]ible and when I die[,] I will get big powers and be the most powerful person…. I want to die, so my sons can take over and I can get my powers."

Caleb continued to refuse to give his name, talked about wanting to die, and talked about the "Garden of Eden." Bowman then initiated an emergency detention due to her concern that Caleb "would inadvertently kill himself."

¶5    The circuit court held a probable cause hearing for Caleb's commitment pursuant to WIS. STAT. § 51.20. At the hearing, Laura Frazier, Caleb's psychiatrist nurse practitioner, testified that Caleb acknowledged stating he wished to die but that "[f]rom the moment—the second day here, he has been denying all suicidal ideations." Further, Frazier stated, "There is no current suicidal ideation. He did acknowledge making the statement, but he said that he would be able to keep himself safe here."

¶6    Caleb also testified at this hearing. Caleb admitted that he asked to be shot, but he stated that this statement was just an expression of frustration and that he did not really wish to die. Caleb further stated that he did not wish to hurt

himself and that he "would never hurt anybody." The circuit court found that there was probable cause to commit him and it ordered an examination of Caleb and a final hearing. Caleb was examined by a psychiatrist, Dr. Michele Andrade, and a psychologist, Dr. Kevin Miller. Bowman, Andrade, and Miller testified at Caleb's final hearing. Bowman's testimony consisted of the facts set forth above. *See supra*, ¶¶3-4.

¶7 Doctor Andrade testified that she diagnosed Caleb with bipolar type severe schizoaffective disorder, cannabis use disorder, and an intellectual developmental disorder. Andrade stated that the schizoaffective disorder caused Caleb to suffer from paranoia and delusions, including that he was Jesus Christ, that people were out to kill him, and that he would receive some kind of powers when he died. Andrade further testified that Caleb had delusions about food contamination, he was concerned that his food was sprayed with chemicals,[4] and he did not believe that he was mentally ill.

¶8 Doctor Andrade opined that Caleb would be at risk of harm to himself without treatment based upon a sheriff's department report she had read, which stated that Caleb had drunk his own urine. She explained that drinking one's own urine can "lead to excess sodium," "can introduce bacteria into [one's] system," and "can produce 'GI' upset." Andrade testified that Caleb has not harmed anyone and that he has not harmed himself, other than to the extent of his drinking urine may have caused him some harm. Andrade opined that Caleb's mental illness could be appropriately treated with medication, noting that he had

---

[4] Doctor Andrade testified that Caleb was not exhibiting any signs of malnourishment at the time she examined him.

done well on it in the past but Caleb stopped taking the medication in 2019 when a prior commitment ended.

¶9 Doctor Miller testified that he had to prematurely end his examination of Caleb due to Caleb standing up and yelling, "I'm not fucking talking to you," and leaving the examination room while screaming. As he was leaving the room, Caleb threw "whatever liquid he was drinking across the hallway." Miller characterized this behavior as threatening and said that it made him feel unsafe, but he "[did not] know if you would consider that dangerous." Miller stated that he had not seen Caleb harm himself in the past year, and he was unaware of any incidents of Caleb harming himself or anyone else in the past year.

¶10 Doctor Miller diagnosed Caleb with schizophrenia due to his delusion that he is going to take over the "Garden of Eden" if he is killed or dies. Miller testified that Caleb has responded well to psychotropic medication in the past and that Caleb is unable to understand or apply an understanding of his medication to himself. When asked whether he thought Caleb would be at risk of harm to himself without treatment, Miller answered in the affirmative because of statements he read in collateral records about Caleb wanting law enforcement to shoot him. Based on what he had read, Miller thought that Caleb had "positive views" on being killed because it was part of a larger religious delusion. In general, according to Miller, people with psychosis are a "high-risk group," and, "theoretically," if symptoms are reduced, then the level of risk is reduced.

¶11 The circuit court found that Caleb suffered from mental illness, that his mental illness was persistent, and that Caleb was "dangerous to himself or others." Regarding Caleb's dangerousness, the court stated:

It is a regrettable fact that we have many cases of suicide by cop. These things are real, and the statements that [Caleb] was making, "Shoot me," cannot be ignored given the circumstances of his past and the circumstances of that moment, so I think they were credible. They were not simply expressions of frustration, which they could have been, but given all the facts and circumstances in this case and his history and his diagnosis, I believe that they were credible and that they remain credible.

I believe that he is subject to treatment and that with medication his treatment can be successful. So I believe that he is dangerous to himself not only because of the suicide by cop statements but the fact that he is drinking his own urine, which clearly has negative biological effects. It doesn't have to kill him and it doesn't have to be a gallon, but the fact that he is drinking his own waste product which has concentrations of sodium and perhaps bacteria and the other things that the doctor testified about are clearly evidence that I find to be persuasive that his own conduct is dangerous to himself or to others.

¶12    In January 2023, the circuit court entered an order for a six-month commitment at a locked inpatient facility and further ordered Caleb's involuntary medication and treatment because he was incapable of applying an understanding of his medication to his mental illness. On the order form, the court checked boxes stating that Caleb was mentally ill and a proper subject for treatment. The court also checked several boxes with language stating that Caleb was dangerous because of "a substantial probability of physical harm to himself" and "a substantial probability of physical harm to others," which were "manifested or shown by" a "recent overt, act, attempt, or threat to act under [WIS. STAT. §] 51.20(1)(a)2.a. or b."

¶13    Caleb now appeals.[5]  Additional facts will be provided as necessary below.

## DISCUSSION

¶14    Caleb argues both that the circuit court failed to make specific factual findings regarding any of the dangerousness standards in WIS. STAT. § 51.20(1)(a)2. and that the County failed to prove, by clear and convincing evidence, that he was dangerous under § 51.20(1)(a)2.a. or b.

¶15    "In our review, we interpret and apply WIS. STAT. § 51.20." *Langlade County v. D.J.W.*, 2020 WI 41, ¶25, 391 Wis. 2d 231, 942 N.W.2d 277. "[W]e will uphold a circuit court's findings of fact unless they are clearly erroneous.  A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." *Id.*, ¶24.  "Whether the facts satisfy the statutory standard is a question of law that we review de novo." *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783.

---

[5] The commitment order and involuntary medication order have expired.  Citing *Sauk County v. S.A.M.*, 2022 WI 46, ¶27, 402 Wis. 2d 379, 975 N.W.2d 162, Caleb argues that his appeal of the commitment order and involuntary medication order is not moot due to the "ongoing collateral consequences of those orders, including the firearm ban and [his] liability for the cost of care and treatment."  Caleb notes that he has been previously committed, but it is unclear as to whether he had a firearm ban from that previous commitment.  The record reflects that Caleb consented to his recommitment prior to the expiration of the orders at issue in this appeal, and therefore, we do not view the firearm ban as a collateral consequence rendering this appeal not moot.  Nevertheless, under WIS. STAT. § 46.10(2), a person's mandatory liability for the cost of the care received during a recommitment is a collateral consequence that renders recommitment appeals not moot, regardless of whether any actual monetary liability has been shown, or whether collection actions have begun.  *See S.A.M.*, 402 Wis. 2d 379, ¶¶25, 27.  The County has not addressed this issue, and we therefore deem it conceded.  *See State v. Anker*, 2014 WI App 107, ¶13, 357 Wis. 2d 565, 855 N.W.2d 483.

¶16    For a person to be involuntarily committed pursuant to WIS. STAT. ch. 51, a petitioner must prove by clear and convincing evidence that the subject individual is "(1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to themselves or others."[6]    *D.J.W.*, 391 Wis. 2d 231, ¶29.    As relevant to this appeal,[7] dangerousness can be established by proving that the individual "[e]vidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm" or that the individual

> [e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.…

WIS. STAT. § 51.20(1)(a)2.a., b.    At commitment proceedings, the circuit court must "make specific factual findings with reference to the subdivision paragraph of § 51.20(1)(a)2. on which the [commitment] is based" due to the important liberty interests at stake and to ensure the soundness of judicial decision making. *D.J.W.*, 391 Wis. 2d 231, ¶¶40, 43-44.

¶17    We first address the circuit court's finding that Caleb was dangerous due to a substantial probability of physical harm to other individuals pursuant to WIS. STAT. § 51.20(1)(a)2.b.    The court broadly stated that Caleb's conduct may be "dangerous to himself or others."    *See supra*, ¶11.    However, the court did not

---

[6]  Caleb does not contest that he is mentally ill or that he is a proper subject for treatment.

[7]  WISCONSIN STAT. § 51.20(1)(a)2. provides five different standards of dangerousness. Caleb and the County agree that § 51.20(1)(a)2.a. and b. are the only standards relevant to this appeal.

make *any* specific factual findings explaining how Caleb presented a substantial probability of physical harm to other individuals beyond identifying the standard of dangerousness. Merely identifying the standard of dangerousness is insufficient. ***D.J.W.***, 391 Wis. 2d 231, ¶3; *see also **Waupaca County v. J.D.C.***, No. 2023AP961, unpublished slip op. ¶20 (WI App Sept. 14, 2023).[8] Accordingly, we agree with Caleb that the court failed to make specific factual findings regarding whether he evidenced a substantial probability of harm to others as required under § 51.20(1)(a)2.b.

¶18 The County briefly argues that the circuit court's finding that Caleb was dangerous to others could be supported by the fact that Dr. Miller felt threatened when Caleb started yelling and left the examination room. However, the court made no such finding. Further, Miller himself questioned whether Caleb's conduct could be considered dangerous. This single instance of the doctor feeling threatened, but not necessarily considering Caleb dangerous, does not constitute clear and convincing evidence of recent homicidal or other violent behavior that placed others in reasonable fear of violent behavior and serious physical harm.

¶19 The County also contends that Caleb wanting to commit "suicide by cop" supports the circuit court's finding that he was dangerous to others because "suicide by cop" is "inherently dangerous to the officers responding" and others who might be in the area. We reject this argument as, again, there is no evidence in the record that "suicide by cop" is inherently dangerous to responding officers

---

[8] Unpublished opinions authored by a single judge and issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

or others, and the court made no such finding. The court was required to make specific factual findings in support of its determination that Caleb was dangerous to others, and it failed to do so. *See **D.J.W.***, 391 Wis. 2d 231, ¶3.

¶20 We next address the circuit court's finding that Caleb was dangerous as set forth in WIS. STAT. § 51.20(1)(a)2.a. due to a substantial probability of physical harm to himself. During its oral ruling, the court stated that Caleb evidenced a substantial probability of harm to himself due to his statements that he wanted police officers to shoot him and due to Caleb drinking his own urine. Because we ultimately reverse Caleb's commitment due to insufficient evidence, we will assume without deciding that the court's findings regarding Caleb's dangerousness to himself sufficiently satisfy the requirement that the court make specific factual findings with reference to § 51.20(1)(a)2.a. *See **Turner v. Taylor***, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (this court need not address all issues raised by the parties if one is dispositive).

¶21 Caleb argues that the County failed to present sufficient evidence to prove that he was a danger to himself under WIS. STAT. § 51.20(1)(a)2.a. Caleb contends that neither his statement of "just shoot me" nor drinking his own urine "[created] a 'substantial probability of physical harm to himself' because neither of these constituted a recent threat of or attempt at suicide or serious bodily harm" as required for a finding of dangerousness under § 51.20(1)(a)2.a. We agree.

¶22 WISCONSIN STAT. § 51.20(1)(a)2.a. states that an individual is dangerous if he or she "[e]vidences a *substantial probability* of physical harm to himself or herself as manifested by evidence of *recent threats of or attempts at suicide or serious bodily harm*." (Emphasis added.) "Substantial probability"

means "much more likely than not." ***Marathon County v. D.K.***, 2020 WI 8, ¶35, 390 Wis. 2d 50, 937 N.W.2d 901.

¶23 Here, the County claimed that Caleb was dangerous due to his statement that he wanted the police to shoot him, which the circuit court found credible and characterized as "suicide by cop." The record reflects, however, that while Caleb stated that he wanted the police to shoot him because he looked forward to achieving some religious state, and Caleb acknowledged making that statement, he also denied having thoughts of self-harm and stated that he was not suicidal.[9] There were two police officers in the room at the time Caleb said that he wanted the police to shoot him. However, at the time Caleb made this statement he was calm. There is no record of Caleb attempting to reach for an officer's gun, of him acting out verbally or physically, or even directly asking an officer to shoot him; in other words, Caleb did not threaten suicide, nor did he act in any way to attempt suicide, by cop or otherwise. Thus, the court's finding in that regard is clearly erroneous.

¶24 Further, although the circuit court found that Caleb's "suicide by cop" claim remained credible, there is no record of Caleb asking to be shot or killed after the day that he was initially detained and assessed. In fact, a psychiatric mental health nurse practitioner testified at the probable cause hearing that after a year of treating Caleb, she had never heard Caleb making a suicidal statement and that there was currently no suicidal ideation.

---

[9] We note that no witness characterized Caleb's actions as an attempt at "suicide by cop."

¶25    Caleb argues that while his statement that he wanted the police to shoot him is certainly concerning, "there is a significant difference between a person expressing 'positive views' of being shot and actually threatening, planning, or initiating an encounter." While a close case, we agree. The record supports the circuit court's finding that Caleb was credible when, in his delusional state, Caleb declared that he wanted to die. As Dr. Miller testified, Caleb had "positive views" of being killed because it was part of a larger religious delusion. However, the record does not support a finding that Caleb attempted to or threatened to commit "suicide by cop" to achieve his religious goals. We therefore conclude that these facts do not rise to the level of threats, or attempts at, suicide or serious bodily harm that make it much more likely than not that Caleb is a danger to himself.

¶26    The County also argues, and the circuit court found, that Caleb is dangerous to himself because he drank his own urine. Again, we disagree, insomuch as the record does not support this finding. First, we note that the County produced no evidence as to when he drank urine, how much urine he drank, how frequently he drank his own urine, or even if he continued to drink his own urine after his brief stay in jail. Further, Dr. Andrade testified that drinking one's own urine "can introduce bacteria," can cause soreness, and can cause "GI upset," and she further testified that Caleb drinking his own urine raises some health concerns. However, Andrade's testimony clearly shows that while potentially unhealthy, the possible consequences of Caleb drinking his own urine do not amount to an attempt at suicide or *serious* bodily harm that makes it much more likely than not that Caleb is physically dangerous to himself. We therefore conclude the court's finding that Caleb was a danger to himself under WIS. STAT. § 51.20(1)(a)2.a. based upon his drinking urine is also clearly erroneous.

¶27　　Seeing no other evidence, nor arguments from the County, that Caleb evidenced a danger to himself, we reverse the January 2023 order for Caleb's involuntary commitment. Because there cannot be an involuntary medication order without an underlying involuntary commitment, we also reverse the involuntary medication order. *See* WIS. STAT. § 51.61(1)(g).

　　　　*By the Court.*—Orders reversed.

　　　　This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.