COURT OF APPEALS
DECISION
DATED AND FILED

December 27, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1589-FT**

STATE OF WISCONSIN

Cir. Ct. No. 2023ME477

IN COURT OF APPEALS
DISTRICT IV

IN THE MATTER OF THE MENTAL COMMITMENT OF M.A.A.:

DANE COUNTY,

PETITIONER-RESPONDENT,

V.

M.A.A.,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Dane County: STEPHEN E. EHLKE, Judge. *Affirmed*.

¶1 TAYLOR, J.[1] M.A.A. appeals an involuntary medication order that was issued in tandem with an order for his involuntary commitment because of

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

mental illness pursuant to WIS. STAT. § 51.20. M.A.A. contends that Dane County ("the County") failed to prove by clear and convincing evidence that M.A.A. was incompetent to refuse medication under WIS. STAT. § 51.61(1)(g)4.b., and that some of the circuit court's factual findings were clearly erroneous. I reject M.A.A.'s arguments and affirm.

## BACKGROUND

¶2 On November 29, 2023, M.A.A. was taken into custody on an emergency detention. According to the detaining officer, M.A.A. had threatened his roommate with physical violence and believed that his roommate had been poisoning M.A.A.'s and M.A.A.'s mother's food.

¶3 On December 1, 2023, after holding a hearing, the circuit court determined that there was probable cause for a WIS. STAT. ch. 51 commitment and an involuntary medication order. The court ordered that M.A.A. be detained at an inpatient facility pending the final hearing on the commitment, administered medication and treatment regardless of his consent, and be examined by Dr. Leslie Taylor, a psychiatrist, and Dr. Michael Lace, a psychologist. Drs. Taylor and Lace each examined M.A.A. and provided independent reports to the court of their examinations that were admitted into evidence at the final hearing.

¶4 On December 11, 2023, the circuit court held the final hearing regarding M.A.A.'s involuntary commitment and medication. Cumulatively, Drs. Taylor's and Lace's testimony, examination reports, and review of collateral sources, including interviews with M.A.A.'s mother and roommate, set forth the following. M.A.A. has a history of mental illness and suffers from a schizophrenia spectrum disorder that is exacerbated by medication noncompliance and for which M.A.A. has been repeatedly hospitalized. M.A.A. has a history of

setting fires, which limits his housing options, such that, at the time of the emergency detention, he was living with his mother and a roommate. His mother reported that, since M.A.A.'s release from his prior commitment, she believed that he had not been taking his medication, was setting fires, was paranoid, shut off all the electronics in the house, did not sleep, and often left the house in the middle of the night to go jogging.

¶5 M.A.A.'s roommate testified at the final hearing that M.A.A. had stopped taking his medication, accused the roommate of poisoning him, and demanded that the roommate not cook for him or touch his or M.A.A.'s mother's food. On the night when police were called, M.A.A. told the roommate he would "beat [his] ass" if M.A.A. or M.A.A.'s mother touched the food the roommate was making. Several weeks prior, M.A.A. had twisted his mother's arm with such force that she had to wear a sling around her arm for two weeks and could not work.

¶6 When he was brought to Winnebago Mental Health Institute ("WMHI") for the emergency detention, M.A.A. was observed to be paranoid, ungroomed, and using his mouth instead of his hands to pick up items. The examination reports collectively concluded that M.A.A. was actively symptomatic for untreated schizophrenia, and he displayed psychotic symptoms such as disorganized thinking, poor impulse control, and impaired judgment and insight. Both examiners and the circuit court concluded that M.A.A. satisfied the criteria for involuntary commitment under WIS. STAT. § 51.20(1)(a)2.b., in that, because of his mental illness, there was a substantial probability M.A.A. would cause physical harm to others. This determination is not challenged on appeal.

¶7    With respect to involuntary medication under WIS. STAT. § 51.61(1)(g), for many of the reasons stated above, Drs. Taylor and Lace concluded in their testimony and examiner reports that M.A.A. was not competent to refuse medication.  Cumulatively, Drs. Taylor's and Lace's testimony and examination reports stated the following.  M.A.A. had not been compliant with taking oral mental health medication after the expiration of his prior involuntary commitment.  In this case, at the time of his emergency detention at WMHI, M.A.A. refused to take Invega, a psychotropic medication that had previously been prescribed for him.  At the December 1, 2023 probable cause hearing, the court commissioner ordered that M.A.A. be involuntarily medicated.  During the examinations, held on December 4 and 5, 2023, M.A.A. denied that he had a mental illness, refused to identify his mental health diagnosis, and insisted that he was misdiagnosed and had no signs or symptoms of mental illness.  As stated, both examiners observed M.A.A. to be experiencing symptoms of schizophrenia that impaired his judgment and insight into his mental illness and his treatment need for antipsychotic medication.

¶8    Dr. Taylor recommended that M.A.A. be involuntarily administered Invega, and she testified that she discussed with M.A.A. the risks, benefits, and alternatives to Invega.  According to Dr. Taylor, M.A.A. was substantially incapable of applying this information to his mental illness because his judgment and insight were impaired by his schizophrenia such that he was adamant that he was not mentally ill, he felt he was doing quite well not taking medication, and he saw no need to resume taking medication.

¶9    After the County presented its evidence, M.A.A. testified that he was currently prescribed medication and that this medication had "sort of" improved his mental health in the past.  M.A.A. also testified that he preferred Invega over

Abilify (a different psychotropic medication) because he was "used to it." When asked if he would choose to continue taking medication, he responded "Yes, but I don't believe I am --" before his counsel interrupted his answer.

¶10 The circuit court concluded that the County met its burden of proving that M.A.A. satisfied the criteria for involuntary commitment and ordered that M.A.A. be committed to a locked facility for six months. The court also concluded that the County met its burden of proving that M.A.A. satisfied the criteria for involuntary medication, stating:

> I suspect he probably will get better and better. And there's no doubt he is moving towards, but I don't think he's yet at the point that he does completely understand the advantages, disadvantages, and alternatives to his or her condition in order to make an informed choice as to whether to accept or refuse psychotropic medications.

The court's written order states that, because of M.A.A.'s "mental illness," M.A.A. is "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his … condition in order to make an informed choice as to whether to accept or refuse psychotropic medications." M.A.A. appeals.[2]

---

[2] M.A.A.'s six-month commitment and involuntary medication orders expired in June 2024, and the County did not seek extensions. M.A.A. argues that his appeal of the expired involuntary medication order is not moot due to the collateral consequences of that order, namely his liability for the costs of care related to the medication order. *See* WIS. STAT. § 46.10(2) (providing that a person committed under WIS. STAT. ch. 51 "shall be liable for the cost of the care, maintenance, services[,] and supplies"); *see also* **Sauk County v. S.A.M.**, 2022 WI 46, ¶¶24-27, 402 Wis. 2d 379, 975 N.W.2d 162 (holding that an appeal of an expired recommitment order was not moot, in part, because the individual was still liable for the costs of care under § 46.10(2)). Because the County does not dispute M.A.A.'s argument that his appeal of the involuntary medication order is not moot, the issue is conceded by the County. *See* **Shadley v. Lloyds of London**, 2009 WI App 165, ¶26, 322 Wis. 2d 189, 776 N.W.2d 838 ("Arguments not rebutted on appeal are deemed conceded.").

## DISCUSSION

### I. Standard of Review and Governing Legal Principles

¶11     The County bears the burden of proving by clear and convincing evidence that M.A.A. is incompetent to refuse medication. *Outagamie County v. Melanie L.*, 2013 WI 67, ¶37, 349 Wis. 2d 148, 833 N.W.2d 607. Whether the County has met its burden presents questions of fact and law. *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. This court upholds a circuit court's findings of fact unless they are clearly erroneous, but independently reviews whether the facts satisfy the statutory standard. *Id.*

¶12     Under WIS. STAT. § 51.61(1)(g) and the liberties protected by the Fourteenth Amendment, a person who has been involuntarily committed under WIS. STAT. ch. 51 has the right to refuse medication and treatment. Sec. 51.61(1)(g)1.; *Melanie L.*, 349 Wis. 2d 148, ¶¶42, 43 ("[C]ompetent individuals have a protected Fourteenth Amendment liberty interest in refusing unwanted medical treatment" and "retain a 'significant' liberty interest in avoiding forced medication of psychotropic drugs." (internal quotation marks and citation omitted)). However, a person who has been committed does not have the right to refuse medication if the circuit court "makes a determination, following a hearing, that the individual is not competent to refuse medication." Sec. 51.61(1)(g)3.

¶13     The standard for determining competency to refuse medication is set forth in WIS. STAT. § 51.61(1)(g)4. As relevant to this appeal, this statute provides:

> [A]n individual is not competent to refuse medication or treatment if, because of mental illness, … and after the advantages and disadvantages of and alternatives to

6

accepting the particular medication or treatment have been explained to the individual, one of the following is true:

a. The individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.

b. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness … in order to make an informed choice as to whether to accept or refuse medication or treatment.

Sec. 51.61(1)(g)4.

¶14   As noted, each examiner determined that M.A.A. met the criteria under WIS. STAT. § 51.61(1)(g)4.b. for involuntary medication, and the circuit court concluded in its written involuntary medication order that the County had met its burden of proof pursuant to § 51.61(1)(g)4.b.

## II.  There Was Sufficient Evidence to Support Involuntary Medication

¶15   On appeal, M.A.A. does not dispute that he has a "mental illness," but he asserts that there was insufficient evidence to support the circuit court's findings of the other criteria required by WIS. STAT. § 51.61(1)(g)4.b. and that the court made erroneous findings.  For the following reasons, I reject M.A.A.'s arguments.

### A.  Explanation of the Advantages and Disadvantages of and Alternatives to Invega

¶16   First, M.A.A. argues that the County did not provide sufficient evidence that he was given a proper explanation of the "advantages and disadvantages of and alternatives to accepting" the proposed medication, which, in this case, was Invega.  *See* WIS. STAT. § 51.61(1)(g)4.b.  I disagree.  As previously

7

noted, prior to Dr. Taylor's evaluation, Invega was being involuntarily administered to M.A.A. Dr. Taylor testified that she recommended that M.A.A. be administered Invega because M.A.A. had previously taken and done well on this medication and that she discussed the "risks, benefits, and alternatives" to Invega with M.A.A. In her examination report, Dr. Taylor further described the specific advantages and disadvantages of and alternatives to Invega that she discussed with M.A.A. Dr. Taylor wrote in her examination report that she provided this information to M.A.A. during her thirty-minute examination of M.A.A. Based on Dr. Taylor's testimony and report, I conclude that the County proved by clear and convincing evidence that M.A.A. was given a proper explanation of the advantages and disadvantages of and alternatives to Invega.

¶17 M.A.A. argues that Dr. Taylor's explanation was not sufficient because she did not provide M.A.A. with an explanation of the nature of his mental illness. This argument fails because WIS. STAT. § 51.61(1)(g)4. requires only that an explanation of the "advantages and disadvantages of and alternatives to accepting the particular medication" be given to the person. M.A.A. does not point to any legal authority that interprets this language in § 51.61(1)(g)4. as requiring an explanation of the nature of the person's mental illness.[3]

---

[3] As additional support for this argument, M.A.A. references a portion of this court's decision in *State v. J.D.B.*, 2024 WI App 61, ¶75, ___ Wis. 2d ___, 13 N.W.3d 525. However, as discussed in more detail below, the portion of *J.D.B.* on which M.A.A. relies involves the causation element of WIS. STAT. § 51.61(1)(g)4.b.—*i.e.*, that a person's inability to apply an understanding of the advantages and disadvantages of and alternatives to a recommended medication be caused by the person's mental illness—not the requirement that the person be given an explanation of the advantages and disadvantages of and alternatives to the recommended medication.

## B. Because of Mental Illness

¶18 Next, M.A.A. argues that the County did not provide sufficient evidence that M.A.A.'s inability to apply to his mental illness an understanding of the advantages and disadvantages of and alternatives to Invega was "because of mental illness." *See* WIS. STAT. § 51.61(1)(g)4. This provision of § 51.61(1)(g)4. requires proof of a causal connection between the person's mental illness and the person's inability to apply an understanding of the advantages, disadvantages, and alternatives to medication to their mental illness in order to make an informed decision about medication. *See* ***State v. J.D.B.***, 2024 WI App 61, ¶70, ___ Wis. 2d ___, 13 N.W.3d 525 (explaining that this standard requires proof that the person's inability to apply an understanding of the advantages, disadvantages, and alternatives of medication to their mental illness was "because of mental illness" and "not some other cause").[4]

¶19 M.A.A. argues that the testimony from Dr. Taylor was insufficient to support the circuit court's finding that M.A.A.'s inability to apply an understanding of the advantages and disadvantages of and alternatives to medication to his mental illness was "because of mental illness." According to M.A.A., Dr. Taylor testified that M.A.A.'s schizophrenia symptoms were distorting his thinking and judgment and that M.A.A. lacked insight into his mental illness, but she never testified that his schizophrenia symptoms were the

---

[4] This court's decision in ***J.D.B.*** was based on the involuntary medication standard for competency to stand trial under WIS. STAT. § 971.14(3)(dm), which uses the same involuntary medication standard applied in an involuntary commitment. *See* WIS. STAT. § 51.61(1)(g)4.; ***J.D.B.***, ___ Wis. 2d ___, ¶69, 13 N.W.3d 525 ("Under … § 971.14(3)(dm), the State must show that [the defendant] was told 'the advantages and disadvantages of and alternatives to accepting the particular medication or treatment[.]'").

*cause* of his lack of insight into his mental illness. In support, M.A.A. points to a portion of ***J.D.B.*** in which this court stated:

> [I]t was [the doctor's] responsibility to explain how [they] probed the issue of why [the individual] did not believe he needed medication. Probing this issue was necessary for the circuit court to determine if [the individual]'s lack of understanding was "because of mental illness" as required by the statute and not some other cause.

***J.D.B.***, ___ Wis. 2d ___, ¶70, 13 N.W.3d 525. I am unpersuaded.

¶20 Here, Dr. Taylor's testimony shows that she probed the issue of the causal connection between M.A.A.'s schizophrenia and his inability to apply an understanding of the advantages and disadvantages of and alternatives to Invega to his mental illness. First, M.A.A. denied having a mental illness and experiencing the symptoms of mental illness. These symptoms, which included distorted and delusional thinking, paranoia about food, aggressive behavior, and unintelligible speech, impaired M.A.A.'s judgment such that he had no insight into his mental illness and was adamant that he was not mentally ill and that he was doing well without medication. Second, although M.A.A. is correct that Dr. Taylor did not explicitly state that M.A.A.'s distorted thinking and judgment was the reason he lacked insight into his mental illness, it was reasonable for the circuit court to infer from Dr. Taylor's testimony that M.A.A.'s schizophrenia symptoms were causing his inability to apply an understanding of the advantages and disadvantages of and alternatives to the recommended medication to his mental illness. *See **Melanie L.**,* 349 Wis. 2d 148, ¶38 ("We accept reasonable inferences from the facts available to the circuit court."). Nothing in ***J.D.B.*** precludes a court from making reasonable inferences from the evidence presented when determining whether the County has met its burden of proof.

¶21   For these reasons, I conclude that the County proved by clear and convincing evidence that M.A.A.'s mental illness was the cause of his inability to apply to his mental illness an understanding of the advantages and disadvantages of and alternatives to Invega in order to make an informed choice about taking or refusing the medication.

### C.  Substantially Incapable of Applying an Understanding of the Advantages, Disadvantages, and Alternatives of Medication to His Mental Illness

¶22   M.A.A. also argues that the circuit court made a clearly erroneous finding when it stated that M.A.A. did not "completely understand" the advantages and disadvantages of and alternatives to Invega.  M.A.A. argues that this oral finding by the court is contrary to Dr. Taylor's testimony that, although M.A.A. understood the advantages and disadvantages of and alternatives to Invega, he could not apply that understanding to his own mental illness in order to make an informed decision about medication because he was in denial about being mentally ill.  According to M.A.A., this oral finding indicates that the court was applying the incompetency standard set forth under WIS. STAT. § 51.61(1)(g)4.a., not the standard set forth under § 51.61(1)(g)4.b., which, M.A.A. argues, was not supported by the evidence presented.  For the following reasons, I reject M.A.A.'s argument that the court's oral finding was clearly erroneous.

¶23   First, M.A.A.'s argument misses the mark because it does not accurately and fully recite the circuit court's statement in its oral determination:  "I don't think [M.A.A. is] yet at the point that he does completely understand the advantages, disadvantages, and alternatives *to his ... condition in order to make an informed choice as to whether to accept or refuse psychotropic medications.*"  (Emphasis added.)  The emphasized portion of the foregoing quote shows that the

court was partially applying the incompetency standard set forth under WIS. STAT. § 51.61(1)(g)4.b. Although the court's oral determination omits the portion of the statutory standard that M.A.A. is "substantially incapable of applying" an understanding of the advantages and disadvantages of and alternatives to Invega to his mental illness, the court's written order accurately recites the standard set forth under § 51.61(1)(g)4.b.:

> [d]ue to … mental illness, … [M.A.A.] is not competent to refuse psychotropic medication or treatment because [M.A.A.] is … substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his … condition in order to make an informed choice as to whether to accept or refuse psychotropic medications.

¶24 Although the circuit court omitted several words in its oral determination that are contained in its written order, "[a] trial court is not required to recite 'magic words' to set forth its findings of fact." *State v. Echols*, 175 Wis. 2d 653, 672, 499 N.W.2d 631 (1993). Therefore, although the court's oral determination was not a verbatim recitation of WIS. STAT. § 51.61(1)(g)4.b., any ambiguity about the court's stated determination was clarified by the unambiguous determination set forth in the court's written order. *See Jackson v. Gray*, 212 Wis. 2d 436, 443, 569 N.W.2d 467 (Ct. App. 1997) ("[W]here the oral pronouncement is ambiguous, it is proper to look at the written judgment to ascertain the court's intention." (alteration in original; citation omitted)).

¶25 Second, M.A.A. argues that the County failed to prove by clear and convincing evidence that M.A.A. was "substantially incapable" of applying his understanding of the benefits, risks, and alternatives to Invega to his own mental health condition. In *Melanie L.*, our supreme court explained that "the phrase 'substantially incapable' means, *to a considerable degree*, a person lacks the

12

ability or capacity to apply an understanding of the advantages and disadvantages of medication to his or her own condition." *Melanie L.*, 349 Wis. 2d 148, ¶70. The court further explained that the phrase "applying an understanding" requires proof that the person be able "to *make a connection* between an expressed understanding of the benefits and risks of medication and the person's own mental illness." *Id.*, ¶71.

¶26 Here, the County met this burden by clear and convincing evidence, as established by the testimony and reports of the evaluators. Dr. Taylor testified that, although M.A.A. was able to express an understanding of the advantages and disadvantages of and alternatives to taking Invega, he was substantially incapable of applying that understanding to his mental illness because he was adamant that he was not mentally ill, that he had been misdiagnosed as having a mental illness, and that he was doing well without medication. M.A.A. maintained these beliefs "despite the very, very clear advantages that [he] has had on medication." Dr. Taylor's report reflected the same conclusion, stating that M.A.A. "denies he has a mental illness and denies his mental illness has anything to do with … his current hospitalization." Dr. Lace also testified that M.A.A. denied having a mental illness. As our supreme court has explained, "if a person cannot recognize that he or she has a mental illness, logically the person cannot establish a connection between his or her expressed understanding of the benefits and risks of medication and the person's own illness." *Id.*, ¶72. Accordingly, I reject M.A.A.'s argument on this issue.

¶27 Lastly, M.A.A. argues that his testimony at the final hearing undermines the circuit court's written conclusion that M.A.A. was "substantially incapable" of applying the risks, benefits, and alternatives to Invega to his own mental illness. As noted, M.A.A. testified at the final hearing that he would prefer

Invega over Abilify because he was "used to" Invega. Additionally, M.A.A. points to Drs. Taylor's and Lace's testimony when they each conceded that M.A.A.'s ability to express a preference between medications would indicate a recent improvement in M.A.A.'s mental illness.[5]

¶28 This argument fails because M.A.A.'s testimony did not undermine the basis for the circuit court's determination—*i.e.*, that M.A.A. denied having a mental illness. M.A.A.'s stated preference for Invega did not establish that he recognized his mental illness or that he recognized that he was experiencing symptoms of his mental illness. Although both evaluators stated that M.A.A.'s ability to express a preference for a medication would be an "improvement" when compared to his condition at the time of their evaluations, neither evaluator stated that such an ability, without more, equates to an ability to apply the benefits, risks and alternatives to Invega to his own mental illness so that M.A.A. could make an informed decision. Thus, M.A.A.'s testimony did not undermine the court's determination, and I reject M.A.A.'s argument to the contrary.

¶29 In sum, the circuit court's conclusion that, because of mental illness, M.A.A. was substantially incapable of applying an understanding of the advantages and disadvantages of and alternatives to Invega to his mental illness, in order to make an informed choice about whether to accept or refuse the medication, was not clearly erroneous and was supported by clear and convincing evidence in the record.

---

[5] At the time of the final hearing, an involuntary medication order had been issued at the probable cause hearing ten days previous, and I assume that M.A.A. had been involuntarily medicated for a period of time after this order and before the final hearing.

## CONCLUSION

¶30 For the foregoing reasons, the involuntary medication order of the circuit court is affirmed.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.